# 13-2742-cv(L),
## 13-2747-cv(CON), 13-2748-cv(CON)

# United States Court of Appeals
## for the
# Second Circuit

MONIQUE SYKES; REA VEERABADREN; KELVIN PEREZ; and CLIFTON ARMOOGAM, Individually and on behalf of all others similarly situated,

*Plaintiffs-Appellees,*

– v. –

*(For Continuation of Caption See Reverse Side of Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLEES

NEW ECONOMY PROJECT
JOSH ZINNER
SUSAN SHIN
CLAUDIA WILNER
176 Grand Street, Suite 300
New York, New York 10013
(212) 680-5100

MFY LEGAL SERVICES, INC.
CAROLYN E. COFFEY
ARIANA LINDERMAYER
*Of Counsel to* JEANETTE ZELHOF
299 Broadway, 4th Floor
New York, New York 10007
(212) 417-3701

EMERY CELLI BRINCKERHOFF & ABADY LLP
MATTHEW D. BRINCKERHOFF
JONATHAN S. ABADY
DEBRA L. GREENBERGER
VASUDHA TALLA
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000

CHARLES J. OGLETREE, JR.
Harvard Law School
1563 Massachusetts Avenue
Boston, Massachusetts 02138
(617) 495-5097

*Attorneys for Plaintiffs-Appellees*

---

MEL S. HARRIS AND ASSOCIATES LLC; MEL S. HARRIS; MICHAEL YOUNG;
DAVID WALDMAN; KERRY LUTZ; TODD FABACHER; LEUCADIA NATIONAL
CORPORATION; L-CREDIT, LLC; LR CREDIT, LLC; LR CREDIT 10, LLC;
LR CREDIT 14, LLC; LR CREDIT 18, LLC; LR CREDIT 21, LLC; JOSEPH A.
ORLANDO; PHILIP M. CANNELLA; SAMSERV, INC.; WILLIAM MLOTOK;
BENJAMIN LAMB; MICHAEL MOSQUERA; and JOHN ANDINO,

*Defendants-Appellants,*

MEL HARRIS JOHN/JANE DOES 1–20; LR CREDIT JOHN/JANE DOES 1–20;
and SAMSERV JOHN/JANE DOES 1–20,

*Defendants.*

---

# TABLE OF CONTENTS

**PAGE NO(s)**:

TABLE OF AUTHORITIES ............................................................... v-xvi

INTRODUCTION .................................................................................1

COUNTER-STATEMENT OF ISSUES PRESENTED FOR REVIEW .................5

FACTS ..................................................................................................6

    I.    CLASS ALLEGATIONS ....................................................6

        A.    Debt Buying Practices ................................................6

        B.    Litigating Debt Collection Cases in New York Courts .............8

        C.    The Scheme ................................................................10

            1.    The Joint Venture ...............................................10

            2.    Samserv ................................................................15

            3.    The Targets .........................................................19

                a.    Class Representatives ..........................19

                b.    Class Members ....................................20

            4.    Class Relief ........................................................20

    II.    STATEMENT OF THE CASE .........................................21

SUMMARY OF ARGUMENT ...............................................................23

ARGUMENT .......................................................................................26

    I.    STANDARD OF REVIEW ..............................................26

    II.    RULE 23(A) IS SATISFIED BECAUSE PLAINTIFFS' CLAIMS ARISING OUT OF THE AFFIDAVITS OF MERIT ARE APPROPRIATE FOR CLASS TREATMENT ................................27

        A.    Defendants Mischaracterize the Class's Claims ................27

B.  The Fraudulent Affidavits of Merit Are Actionable Regardless of Whether Class Members Were Actually Served ................................................................................. 29

C.  The Affidavits of Merit Were Executed as Part of Defendants' Uniform Practice and Raise Common Questions .................................................................. 35

D.  Class Members Have Suffered a Common Injury ................... 36

     1.  The Judgment Is Itself an Injury, Regardless of Whether the Debts Were Owed ...................................... 36

     2.  Defendants' Fraud Is Actionable Regardless of Whether Class Members May Owe an Underlying Debt.............. 38

         a.  FDCPA Claims Are Actionable Regardless of Underlying Debts .................................................. 38

         b.  RICO, GBL, and JL Claims Are Actionable Regardless of the Validity of the Underlying Debts .................................................................. 41

     3.  Issues of Service Do Not Affect the Injury Caused by the Entry of the Default Judgment ................................. 46

E.  Commonality is Satisfied Where Plaintiffs Identify Questions That Can Be Resolved on a Class-wide Basis ........ 47

III.  RULE 23(B)(3) IS SATISFIED BECAUSE COMMON QUESTIONS REGARDING THE AFFIDAVITS OF MERIT PREDOMINATE ................................................................. 51

A.  The District Court Appropriately Analyzed Predominance And Determined That Common Questions Predominate ........ 51

B.  Plaintiffs' Damages Can Be Resolved Class-Wide ................. 54

     1.  Statutory Damages ........................................................... 54

     2.  Return Of Money Extracted ........................................... 54

     3.  Incidental Damages ........................................................ 57

C.      Any Individualized Damages Inquiry Does Not Defeat Predominance ........................................................................58

       1.      The Supreme Court Has Ruled: "Individualized monetary claims belong in Rule 23(b)(3)" ....................59

D.      The Class Does Not Seek the Benefit of Equitable Tolling .....62

E.      Forum and Superiority .............................................................63

       1.      A Class Action Is the Superior Method for Resolving the Class Members' Claims, Which Would Otherwise Be Unredressed ..............................................................63

       2.      Defendants Misconstrue the "Forum" Requirement ......64

       3.      The Full Faith and Credit Clause Does Not Undermine Class Certification or Plaintiffs' Claims........................67

IV.    PLAINTIFFS' CLAIMS ARISING OUT OF FALSE AFFIDAVITS OF SERVICE CAN BE RESOLVED ON A CLASS-WIDE BASIS ........................................................................70

V.     SAMSERV IS A PROPER CLASS ACTION DEFENDANT...........76

VI.    THE CLASS CERTIFICATION ORDER COMPLIES WITH RULE 23(C)(1)(B) ................................................................................77

VII.   CERTIFICATION OF A CLASS PURSUANT TO RULE 23(B)(2) IS APPROPRIATE BECAUSE DEFENDANTS ACTED IN A MANNER GENERALLY APPLICABLE TO THE CLASS AND INJUNCTIVE RELIEF WILL BENEFIT THE ENTIRE CLASS ............................................79

VIII.  THE THREE MERITS QUESTIONS THAT DEFENDANTS ATTEMPT TO INSERT AT THE CLASS CERTIFICATION STAGE SHOULD ULTIMATELY BE RESOLVED IN THE CLASS'S FAVOR ............................................................................85

A.      *Rooker-Feldman* Does Not Bar Plaintiffs' Damages Claims .......................................................................................85

B.    FDCPA Applies to Statements Made by Defendants to Courts ........................................................................92

C.    Injunctive Relief Is Available to the Class Under RICO..........97

CONCLUSION ...................................................................................................103

# TABLE OF AUTHORITIES

**PAGE NO(s)**:

**Federal Cases**

*Abby v. Paige*,
    10-23589-CIV, 2013 WL 141145 (S.D. Fla. Jan. 11, 2013) ........................40

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.*,
    483 U.S. 143 (1987)................................................................................100

*Allianz Ins. Co. v. Lerner*,
    416 F.3d 109 (2d Cir. 2005) ........................................................................65

*Astiana v. Kashi Co.*,
    291 F.R.D. 493 (S.D. Cal. 2013) ..................................................................61

*Baker v. G. C. Servs. Corp.*,
    677 F.2d 775 (9th Cir. 1982) ........................................................................40

*California v. Am. Stores Co.*,
    495 U.S. 271 (1990)................................................................................100

*Canyon Cnty. v. Syngenta Seeds, Inc.*,
    519 F.3d 969 (9th Cir. 2008) ........................................................................37

*Carnegie v. Household Intern., Inc.*,
    376 F.3d 656 (7th Cir. 2004) ........................................................................63

*Casale v. Kelly*,
    257 F.R.D. 396 (S.D.N.Y. 2009)..................................................................83

*Cathode Ray Tube (CRT) Antitrust Litig.*,
    MDL 1917, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013)........................61

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994)................................................................................101

*Chambers Dev. Co. v. Browning-Ferris Indus.*,
    590 F. Supp. 1528 (W.D. Pa. 1984) ............................................................99

*Charron v. Pinnacle Grp. N.Y. LLC*,
    269 F.R.D. 221 (S.D.N.Y. 2010)..................................................83

*Coble v. Cohen & Slamowitz*,
    2013 WL 1500418 (S.D.N.Y. Apr. 10, 2013) .............................88

*Compare NOW, Inc. v. Scheidler*,
    267 F.3d 687 (7th Cir. 2001), *rev'd on other grounds*,
    537 U.S. 393 (2003)...................................................... 96, 98, 99

*Connecticut Nat'l Bank v. Germain*,
    503 U.S. 249, 253 (1992) ............................................................98

*DeMent v. Abbott Capital Corp.*,
    589 F. Supp. 1378 (N.D. Ill. 1984)............................................96

*DeRosa v. Nat'l Envelope Corp.*,
    595 F.3d 99 (2d Cir. 2010) ........................................................34

*Dina v. Cuda*,
    No. 3:12-cv-0523, 2013 WL 2995439 (D. Conn. 2013) ..............93

*Dowlah v. Dowlah*,
    No. 09 Civ. 2020, 2010 WL 889292 (E.D.N.Y. Mar. 10, 2010)..................90

*Drees v. Ferguson*,
    396 Fed. App'x 656 (11th Cir. 2010) .........................................90

*Ellis v. J.P. Morgan Chase & Co.*,
    No. 12-CV-03897, 2013 WL 2921799 (N.D. Cal. June 13, 2013) ..............37

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
    544 U.S. 280 (2005)............................................................. *passim*

*Francis ex rel. Francis v. City of New York*,
    197 Fed. Appx. 27 (2d Cir. 2006) ..............................................87

*Friedman-Katz v. Lindt & Sprungli (USA), Inc.*,
    270 F.R.D. 150 (S.D.N.Y. 2010)................................................34

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)...................................................................83

*Gabriele v. American Home Mortgage Services, Inc.*,
    503 Fed. App'x 89 (2d Cir. 2012) ................................................................87

*GASH Assocs. v. Rosemont*,
    995 F.2d 726 (7th Cir. 1993) ........................................................................86

*Goldman v. Cohen*,
    445 F.3d 152 (2d Cir. 2006) ........................................................................92

*Gray v. Americredit Financial Servs., Inc.*,
    No. 07 Civ. 4039, 2009 WL 1787710 (S.D.N.Y. June 23, 2009) ................88

*Great Western Mining & Mineral Co. v. Fox Rothschild LLP*,
    615 F.3d 159 (3d Cir. 2010) ................................................................ 87, 89

*Hamid v. Stock & Grimes, LLPf*,
    876 F. Supp. 2d 500 (E.D. Pa. 2012)................................................ 39, 43, 44

*Harvey v. Great Seneca Financial Corp.*,
    453 F.3d 324 (6th Cir. 2006) ................................................................ 31, 32

*Heintz v. Jenkins*,
    514 U.S. 291 (1995)................................................................................ 94, 95

*Hoblock v. Albany Cnty. Bd. of Elections*,
    422 F.3d 77 (2d Cir. 2005) ..........................................................................85

*Holmes v. SIPC*,
    503 U.S. 258 (1992)....................................................................................100

*In re Alstom SA Sec. Litig.*,
    253 F.R.D. 266 (S.D.N.Y. 2008)..................................................................35

*In re Alstom SA Securities Litigation*,
    253 F.R.D. 266 (S.D.N.Y. 2008)..................................................................70

*In re High-Tech Employee Antitrust Litig.*,
    289 F.R.D. 555 (N.D. Cal. 2013) ................................................................60

*In re Martins v. 3PD, Inc.*,
    2013 WL 1320454 (D. Mass. Mar. 28, 2013) ..............................................60

*In re Nassau Cnty. Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006) ................................................................ *passim*

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013) ................................................................ *passim*

*Isa v. Law Office of Timothy Baxter & Assocs.*,
    No. 13-cv-11284 (E.D. Mich. Oct. 21, 2013) ................................................ 40

*Jeffreys v. City of New York*,
    426 F.3d 549 (2d Cir. 2005) ........................................................................ 71

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*,
    559 U.S. 573 (2010) ............................................................................. 91, 95

*Keele v. Wexler*,
    149 F.3d 589 (7th Cir. 1998) ....................................................................... 39

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) .................................................................................. 100

*Krawczyk v. Centurion Capital Corp.*,
    06-C-6273, 2009 WL 395458 (N.D. Ill. Feb. 18, 2009) .............................. 40

*Kremer v. Chemical Const. Corp.*,
    456 U.S. 461 (1982) .................................................................................... 67

*Kropelnicki v. Siegel*,
    290 F.3d 118 (2d Cir. 2002) ........................................................................ 94

*Kuria v. Palisades Acquisition XVI, LLC*,
    752 F.Supp.2d 1293 (N.D.Ga. 2010) ........................................................... 32

*Lebron v. Mann*,
    40 F.3d 561 (2d Cir. 2004) .......................................................................... 43

*Levya v. Medline Indus., Inc.*,
    716 F.3d 510 (9th Cir. 2013) ....................................................................... 59

*Leyva v. Medline Indus. Inc.*,
    716 F.3d 510 (9th Cir. 2013) ................................................................ 54, 60

*Mansfield v. Midland Funding, LLC*,
    09CV358 L WVG, 2011 WL 1212939 (S.D. Cal. Mar. 30, 2011) ..............32

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997) .........................................................................36

*Marshall v. Grant*,
    521 F. Supp. 2d 240 (E.D.N.Y. 2007).........................................................86

*Mascoll v. Strumpf*,
    No. 05 Civ. 667, 2006 WL 2795175 (E.D.N.Y. Sept. 26, 2006) .................89

*McCartney v. First City Bank*,
    970 F.2d 45 (5th Cir. 1992) .........................................................................39

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008) .........................................................................47

*McNamara v. Kaye*,
    360 Fed. Appx. 177 (2d Cir. 2009) ..............................................................89

*Mello v. Great Seneca Financial Corp.*,
    526 F. Supp. 2d 1020 (C.D. Cal. 2007).......................................................32

*Midland Funding LLC v. Brent*,
    644 F. Supp. 2d 961 (N.D. Ohio 2009) .......................................................93

*Morris v. Jones*,
    329 U.S. 545 (1947)......................................................................................68

*Mortgage Advisors, Inc. v. Lewis*,
    444 U.S. 11 (1979)........................................................................................99

*Motorola Credit Corp. v. Uzan*,
    202 F. Supp. 2d 239 (S.D.N.Y. 2002), *rev'd on other grounds*,
    322 F.3d 130 (2d Cir. 2003) .........................................................................96

*Nesses v. Shepard*,
    68 F.3d 1003 (7th Cir.1995) .........................................................................90

*O'Rourke v. Palisades Acquisition*,
    635 F.3d 938 (7th Cir. 2011) ........................................................................93

*Okyere v. Palisades Collection, LLC,*
    No. 12 Civ. 1453, 2013 WL 5085148 (S.D.N.Y. Sept. 16, 2013) ...............95

*Parker v. Time Warner Entm't Co.,*
    331 F.3d 13 (2d Cir. 2003) ...........................................................26

*Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.,*
    866 F.2d 228 (7th Cir. 1988) .......................................................27

*Pipiles v. Credit Bureau of Lockport, Inc.,*
    886 F.2d 22 (2d Cir. 1989) ...........................................................92

*Polanco v. NCO Portfolio Mgmt., Inc.,*
    930 F. Supp. 2d 547 (S.D.N.Y. 2013) .........................................95

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979).....................................................................37

*Religious Technology Ctr. v. Wollersheim,*
    796 F.2d 1076 (9th Cir. 1986) .....................................................96

*Riehle v. Margolies,*
    279 U.S. 218 (1929).....................................................................67

*Robidoux v. Celani,*
    987 F.2d 931 (2d Cir. 1993) .........................................................70

*Romano v. SLS Residential Inc.,*
    246 F.R.D. 432 (S.D.N.Y. 2007).................................................35

*Rotella v. Wood,*
    528 U.S. 549 (2000).....................................................................99

*Sedima, S. P. R. L. v. Imrex Co.,*
    473 U.S. 479 (1985).......................................................... 75, 100

*Sedima, S.P.R.L. v. Imrex Co.,*
    741 F.2d 482 (2d Cir. 1984), *rev'd on other grounds,*
    473 U.S. 479 (1985).....................................................................96

*Seijas v. Republic of Argentina,*
    606 F.3d 53 (2d Cir. 2010) ...........................................................59

*Shearson/Am. Exp., Inc. v. McMahon*,
    482 U.S. 220 (1987)..................................................................100

*Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs*,
    531 U.S. 159 (2001)..................................................................101

*Sparrow v. Mazda Am. Credit*,
    385 F. Supp. 2d 1063 (E.D. Cal. 2005) ........................................40

*Steel Co. v. Citizens for a Better Environment*,
    523 U.S. 83 (1998)....................................................................98

*Sykes v. Mel Harris & Assocs., LLC*,
    757 F. Supp. 2d 413 (S.D.N.Y. 2010) ..........................................21

*T.R.W., Inc. v. Andrews*,
    534 U.S. 19 (2001)....................................................................48

*Trakansook v. Astoria Fed. Sav. & Loan Ass'n*,
    No. 07-2224-CV, 2008 WL 4962990 (2d Cir. Nov. 21, 2008)....................87

*Trane Co. v. O'Connor Secs.*,
    718 F.2d 26 (2d Cir. 1983) ........................................................96

*Truong v. Wells Fargo Bank, N.A.*,
    717 F.3d 377 (5th Cir. 2013) ......................................................86

*United States v. Johnson*,
    212 F. Supp. 2d 202 (S.D.N.Y. 2002) ..........................................43

*United States v. Lauersen*,
    98 CR. 1134 (WHP), 1999 WL 637237 (S.D.N.Y. Aug. 20, 1999) ............42

*United States v. Ron Pair Enters., Inc.*
    489 U.S. 235, 242 (1989) ..........................................................92

*United States. v. Gole*,
    158 F.3d 166 (2d Cir. 1998) ......................................................42

*W & D Imports, Inc. v. Lia*,
    No. 11-cv-4144, 2013 WL 1750892 (E.D.N.Y. Apr. 22, 2013) ..................87

*Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*,
    453 F.3d 179 (3d Cir. 2006) ........................................................................77

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180, 1191-92 *opinion amended on denial of reh'g*,
    273 F.3d 1266 (9th Cir. 2001) ..................................................................64

*Zwickler v. Koota*,
    389 U.S. 241 (1967)...................................................................................66

## **STATE CASES**:

*Amalfitano v. Rosenberg*,
    874 N.Y.S.2d 868 (2009)..........................................................................45

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
    133 S. Ct. 1184 (2013)................................................................... *passim*

*Barr v. Dep't of Consumer Affairs of City of N.Y.*,
    517 N.E.2d 1321 (N.Y. 1987) ..................................................................73

*Beaton v. Transit Facility Corp.*,
    14 A.D.3d 637 (N.Y. App. Div. 2005) ......................................................29

*Comcast Corp. v. Behrend*,
    133 S.Ct. 1426 (2013)................................................................... *passim*

*Continental Hosts, Ltd. v. Levine*,
    565 N.Y.S.2d 222 (2d Dep't 1991) ...........................................................72

*Edwards v. State*,
    181 N.W.2d 383 (Wis. 1970) ...................................................................44

*First Commercial Bank of Memphis v. Ndiaye*,
    733 N.Y.S.2d 562 (N.Y. Sup Ct. 2001).....................................................72

*Fuhrmann v. Fanroth*,
    254 N.Y. 479 (1930)..................................................................................68

*Hooks v. Forman, Holt, Eliades & Ravin, LLC*,
    717 F.3d 282 (2d Cir. 2013) ......................................................................92

*Hudson House, LLC v. Gabriel*,
759 N.Y.S.2d 287 (App. Term. First Dep't 2002) ........................................73

*Inter-Ocean Realty Assoc. v. JSA Realty Corp.*,
587 N.Y.S.2d 837 (N.Y. City Civ. Ct. N.Y. Cty. 1991)................................72

*Matter of 367 E. 201st St. LLC v. Velez*,
917 N.Y.S.2d 814 (Sup. Ct. 2011) ..............................................................33

*Mauro v. General Motors Acceptance Corp.*,
164 Misc.2d 871, 626 N.Y.S.2d 374 (Sup. Ct. Albany Cnty. 1995)............43

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
623 N.Y.S.2d 529 (1995)........................................................................ 37, 45

*Parker v. Hoefer*,
2 N.Y.2d 612 (1957)....................................................................................67

*People v. Green*,
5 N.Y.3d 538, 841 N.E.2d 289 (2005) .......................................................43

*People v. Pagan*,
968 N.E.2d 960 (N.Y. 2012) .......................................................................44

*People v. Reid*,
69 N.Y.2d 469 (1987)..................................................................................42

*Rose Assoc. v. Becker*,
583 N.Y.S.2d 144 (N.Y. City Civ. Ct. N.Y. Cty. 1992)...............................72

*Ross v. RBS Citizens, N.A.*,
667 F.3d 900, 907 (7th Cir. 2012), *vacated and remanded on other grounds*,
*RBS Citizens, N.A. v. Ross*, 133 S. Ct. 1722 (2013) .....................................77

*Shechet v. Abby Favali Corp. Counsel NYC*,
No. 05-CV-5027, 2006 WL 1308656 (2d Cir. May 9, 2006).......................90

*United States v. Allen*,
155 F.3d 35 (2d Cir. 1998) ..........................................................................75

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011)........................................................................ *passim*

*Woodson v. Mendon Leasing Corp.*,
    100 N.Y.2d 62, 790 N.E.2d 1156 (2003) ................................................. 9, 31

*Zelnik v. Bidermann Industries U.S.A.*,
    662 N.Y.S.2d 19 (1st Dep't 1997)................................................................31

## **STATUTES:**

15 U.S.C. § 16 ........................................................................................................100

15 U.S.C. § 1692 *et seq*. ................................................................... 3, 91, 92

15 U.S.C. § 1692k(a)(1) ................................................................................45

15 U.S.C. § 1692k(a)(2)(B) ..........................................................................53

18 U.S.C. § 1341 ............................................................................................42

18 U.S.C. § 1964(c) ............................................................................... 75, 97

18 U.S.C. §§ 1961-1968 ......................................................................... 3, 78

22 N.Y.C.R.R. § 81.1(b)(1) .........................................................................33

28 U.S.C. § 1331 ............................................................................................65

28 U.S.C. § 1738 ("FFCA")..........................................................................66

CPLR § 5015(a)(1)........................................................................................81

CPLR § 5015(a)(3)........................................................................................81

CPLR § 5015(a)(4)........................................................................................81

CPLR 308(2) ......................................................................................... 17, 33

CPLR 308(4) ..................................................................................................17

CPLR 3215......................................................................................................46

CPLR 3215(a) ................................................................................................10

CPLR 3215(f) ......................................................................................... 29, 31

CPLR 5222......................................................................................................9

CPLR 5224(a)(4) .................................................................................... 9

CPLR 5304(b) ...................................................................................... 68

Federal Jury Practice And Instructions, Civil, § 105.04 ........................... 71

GBL § 89-cc ......................................................................................... 72

GBL § 89-cc(1) ...................................................................................... 72

N.Y. Penal Law § 160.00 ....................................................................... 43

N.Y.C. Civil Court Rules 208.6(h) .......................................................... 33

N.Y.C. Civil Ct. Directive DRP-182 (May 2009) ..................................... 33

New York General Business Law ("GBL") § 349 .......................... *passim*

New York Judiciary Law ("JL") § 487 .............................................. 4, 20

NY Const. VI, § 28 ................................................................................. 33

Pub. L. No. 91–452, § 904(a), 84 Stat. 947 (1970) ................................ 99

RICO § 1964(c) ..................................................................................... 45

Rule 23(a) ............................................................................................... 5

## **RULES:**

22 NYCRR § 208.29 .............................................................................. 72

Fed. R. Civ. P. 23(b)(2) and (b)(3) ................................................ passim

Fed. R. Civ. P. 23(c)(1)(B) ............................................................. 76, 77

Fed. R. Civ. P. 23(f) .............................................................................. 22

Fed. R. Civ. P. 23) ................................................................................. 62

Fed. R. Civ. P. 37(b)(2)(A) ............................................................. 74, 78

Fed. R. Civ. P. 68 .................................................................................. 21

## OTHER AUTHORITIES:

2 Newberg on Class Actions § 4:71 (5th ed.) ...........................................................64

Federal Trade Commission, Collecting Consumer Debts: The Challenges of
    Change, A Workshop Report 12-13 (Feb. 2009) ...........................................6

Federal Trade Commission, *The Structure and Practices of the Debt Buying
    Industry* 18, 38, 43 (Jan. 2013) .......................................................................7

Peter A. Holland, *Defending Junk-Debt-Buyer Lawsuits*, Clearinghouse Rev., May-
    June 2012, at 23, http://ssrn.com/abstract=2079155 ......................................8

Jeff Horwitz, *Bank of America Sold Card Debts to Collectors Despite Faulty
    Records*, Am. Banker, Mar. 29, 2012 ...............................................................8

N.Y. State Legislative Annual (1986) ...................................................................72

Peter A. Holland, *The One Hundred Billion Dollar Problem in Small Claims
    Court: Robo-Signing and Lack of Proof in Debt Buyer Cases*, 6 J. Bus. &
    Tech. L. 259, 262 (2011) .................................................................................7

Rubenstein, Newberg on Class Actions § 4:54 at 205 (5th ed. 2012)....................59

## INTRODUCTION

Ten years ago, Defendants-Appellants Leucadia National Corporation (through its L-Credit, LLC subsidiary) and Mel S. Harris and Associates (through an entity formed by its principals and key employees) formed a massive, joint venture scheme to purchase defaulted debts and collect them through the New York City Civil Court ("Civil Court"). The Leucadia Defendants supply the capital, the Mel Harris Defendants provide the legal representation, and the Samserv Defendants are the process servers (in name only).[1] In order to obtain default judgments in every case, Defendants submit two false affidavits—one attesting to service, the other claiming personal knowledge that a debt is owed. This fraud permits Defendants to convert basically worthless allegations that debts are owed into highly lucrative default judgments. Defendants' default judgment enterprise continues to operate even now, over four years after this action was commenced and their fraudulent conduct exposed.

Defendants' default judgment mill purchases large tranches of charged off consumer debt from other debt buyers and bundlers who have often

---

[1] There are three groups of Defendants-Appellants in these consolidated appeals. The "Samserv Defendants" collectively filed appeal No. 13-2742(L), the "Mel Harris Defendants" collectively filed appeal No. 13-2748 (CON), and the "Leucadia Defendants" collectively filed appeal No. 13-2747 (CON). Each group also filed separate briefs, while Plaintiffs-Appellants file this consolidated brief on all three appeals.

1

bought and sold the debt many times over before it is purchased by Defendants. Defendants never purchase debt from the original creditor. They buy the debt for pennies on the dollar and at rock bottom prices, in part because they receive only a spreadsheet containing a list of names with contact information and the amount each person allegedly owes. No other evidence of indebtedness is ever provided along with the spreadsheet, and the sellers affirmatively disclaim any warranty as to the accuracy of the information. Because it is plain to everyone that this information is insufficient to allow a debt buyer to obtain a default judgment, much less a contested judgment in court, law-abiding buyers understand that their only hope of collection lies in contacting a consumer and convincing them to pay voluntarily. Defendants, however, are not law abiding.

In Civil Court, applications for default judgments in consumer debt cases are governed by CPLR 3215 and are processed by court clerks, not by judges. Unlike in federal court, no inquest is required. The Civil Court publishes a checklist of items required to obtain a default judgment in compliance with the CPLR; among other things, the checklist mandates that every motion for a default judgment must include an "Affidavit of Service" and "Affidavit of Facts from a person with personal knowledge of the facts," typically referred to as an affidavit of merit.

Defendants submit the items required by the checklist, including an affidavit of merit swearing, on "personal knowledge," that the person sued entered into a consumer credit contract, incurred charges, received billing statements, and failed to contest the statements or pay. The affidavits of merit in every case are materially identical. Each and every affidavit of merit is materially false because Defendants do not have knowledge of the matters to which they attest and have no information in their possession to support their sworn statements. The only truthful statement Defendants could make is that they obtained the person's name and amount allegedly owed from a chain of other debt buyers and that the seller expressly disclaimed the accuracy of the information—but this statement would not entitle Defendants to a default judgment. Because the affidavits of merit appear facially valid, the Civil Court relies on them and enters judgment. Defendants then immediately seek to execute upon the judgments by freezing bank accounts and garnishing wages.

Based on these facts alone, Judge Chin exercised sound discretion in certifying both an injunctive and damages class, pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), consisting of the more than 100,000 victims of Defendants' long-running and ongoing illegal scheme. Defendants' uniform and consistent submission of materially false affidavits of merit is independently actionable under the statutes at issue in this case, i.e., the Fair Debt Collection Practices Act, 15

U.S.C. § 1692 et seq. ("FDCPA"), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"), New York General Business Law ("GBL") § 349, and New York Judiciary Law ("JL") § 487, and gives rise to a raft of common issues subject to class-wide resolution that predominate over any individual issues, thus satisfying Rule 23.  But there is more.

Along with the affidavits of merit, Defendants also engage in a second, equally fraudulent practice that gives rise to the exact same claims and produces identical injury.  Defendants submit fraudulent affidavits of service along with their fraudulent affidavits of merit.  And, while resolving the propriety of service might at first blush appear to be an individual issue unsusceptible to class-wide resolution, under the unique circumstances of this case it is not.  Here, Plaintiffs submitted evidence of widespread perjury to the District Court that calls into question each and every affidavit of service.  And the Samserv Defendants have lost or destroyed key documents, which leaves them without admissible evidence to submit in response to summary judgment.  Given these facts, the legality of Defendants' affidavits of service can be resolved on a class-wide basis.

Though Defendants strain to convince this Court that service of process is the only issue in this case, logic and the record proves them wrong at every turn.  Service of process is a second act that may need never to be resolved if Plaintiffs prevail on the affidavits of merit, which independently present

4

quintessential claims amenable to certification under Rule 23(b)(3), and also

predominate over any individual issues as the District Court found.  Indeed, upon

remand to Judge Chin, and in the exercise of his sound discretion, a logical course

of litigation would include bifurcating for trial Plaintiffs' claims challenging the

affidavits of merit from the claims concerning the affidavits of service.  Both are

independent.  Both produce identical injury.  Because each and every affidavit of

merit is materially identical, a judgment in Plaintiffs' favor on those claims will

obviate the need to even address Plaintiffs' claims on the affidavits of service.

   The District Court did not abuse its discretion in certifying this case as

a class action.  This Court should affirm and remand so that Judge Chin can

continue to exercise his sound discretion in managing the conduct of this action as

envisioned by Rule 23(d).

## COUNTER-STATEMENT OF ISSUES PRESENTED FOR REVIEW

   1. Whether the District Court abused its discretion in finding

commonality under Rule 23(a), where Defendants engaged in a common course of

conduct using fraudulent affidavits to obtain default judgments.

   2. Whether the District Court abused its discretion in certifying a

class pursuant to Rule 23(b)(3) and making the factual determination that the

common issue concerning Defendants' fraudulent affidavits of merit predominates

over purported differences regarding service and the underlying debts.

3.      Whether the District Court abused its discretion in certifying a class action pursuant to Rule 23(b)(2), where the injunctive relief sought will benefit each member of the class.

4.      Whether the District Court abused its discretion in refraining from a wide-ranging merits inquiry at the class certification stage into questions common to the class, such as whether a category of Plaintiffs' damages are barred by *Rooker-Feldman*, whether the FDCPA extends to fraudulent communications made to state courts, and whether injunctive relief is available to private parties under RICO.

## FACTS

## I.    CLASS ALLEGATIONS

### A.    Debt Buying Practices

The debt buyer industry has flourished in the past decade, purchasing for pennies on the dollar purported debts that the original creditor views as uncollectible.  *See* Federal Trade Commission, Collecting Consumer Debts: The Challenges of Change, A Workshop Report 12-13 (Feb. 2009) [hereinafter "2009 FTC Report"].[2]  These alleged debts are deemed uncollectible not simply because the accountholder is poor, or debt collection is resource-consuming, but often because they are disputed, time-barred, discharged in bankruptcy, products of

---

[2] Available at http://www.ftc.gov/bcp/workshops/debtcollection/dcwr.pdf.

identity theft, or generally lacking documentation.  *See* Federal Trade Commission, *The Structure and Practices of the Debt Buying Industry* 18, 38, 43 (Jan. 2013) [hereinafter "2013 FTC Report"].[3]

When debt buyers purchase a portfolio of debts, they typically acquire minimal information for each account in the portfolio: the consumer's name, Social Security number, last known address and telephone number; and the account number, charge-off date, and amount allegedly owed.[4]  2013 FTC Report 29-30.  This information, known as "media," is transmitted to the debt buyer electronically, in a spreadsheet format created solely for purposes of the sale.  At the time of purchase, the debt buyer typically does not acquire the original creditor's documents showing indebtedness, such as a contract, account statements, or dispute history.  2013 FTC Report at 35-37; Peter A. Holland, *The One Hundred Billion Dollar Problem in Small Claims Court: Robo-Signing and Lack of Proof in Debt Buyer Cases*, 6 J. Bus. & Tech. L. 259, 262 (2011).

Moreover, debt purchase and sale agreements almost always limit the debt buyer's right to obtain documentation of the debts from the original creditor, and some agreements bar them from doing so altogether.  2013 FTC Report 26, 39-

---

[3] Available at www.ftc.gov/os/2013/01/debtbuyingreport.pdf.

[4] After six months, an original creditor will "charge off" an account as bad debt. *See* 2009 FTC Report at 3; *see also* 65 Fed. Reg. 36903-36904 (June 12, 2000) ("charge off" is an accounting term).

40.  Debt buyers also frequently resell debts to other debt buyers; each time a debt is resold, it becomes less likely that the purchaser will be able to obtain documentation of the debt.  2013 FTC Report 27-28.  Assuming a rational market for debt portfolios, this lack of documentation reduces the value of debts sold to pennies, or even fractions of a penny, on the dollar. 2013 FTC Report 23; 2009 FTC Report 23; Jeff Horwitz, *Bank of America Sold Card Debts to Collectors Despite Faulty Records*, Am. Banker, Mar. 29, 2012 [hereinafter Horwitz].[5]

Furthermore, purchase and sale agreements disclaim the accuracy of the very account information being sold, expressly warranting that the debts may be invalid.  *See* 2013 FTC Report 25, 27; Horwitz; Peter A. Holland, *Defending Junk-Debt-Buyer Lawsuits*, Clearinghouse Rev., May-June 2012, at 23, http://ssrn.com/abstract=2079155 [hereinafter "Holland, Defending"].  No one, in good faith, could rely solely on these spreadsheets as evidence that a debt is truly owed.

## B.    Litigating Debt Collection Cases in New York Courts

Increasingly, debt buyers in New York have turned to the courts to collect debts.  Because of the powerful enforcement options available once a judgment is obtained, litigation is an attractive alternative to dunning consumers by

---

[5] Available at http://www.americanbanker.com/issues/177_62/bofa-credit-cards-collections-debts-faulty-records-1047992-1.html.

phone or mail.  For example, an attorney may garnish employment earnings and locate, restrain, and levy bank accounts without court involvement.  CPLR 5222, 5231.  They may do the latter electronically, barraging banks with information subpoenas with the press of a button.  CPLR 5224(a)(4).

Of course, to obtain a judgment, a plaintiff must be able to prove its case.  This step is effectively impossible for debt buyers, whose business model is predicated on acquiring debts that are cheap because they lack the documentation needed to prove the consumer actually owes them and for the amount claimed. 2013 FTC Report 30.  Without this documentation, a plaintiff cannot make a prima facie case, and contested cases are rarely, if ever, won.  *See* Holland, Defending at 14-15; AA125, 127.

The courts in New York, as compared to other jurisdictions, are particularly attractive collection tools because plaintiffs can obtain default judgments with notorious ease.  While a default judgment must be supported by enough facts to state a viable cause of action, the plaintiff may present these facts in the form of an affidavit of merit based on personal knowledge.  *Woodson v. Mendon Leasing Corp.*, 790 N.E.2d 1156, 1160-62 (N.Y. 2003).  The application need not include the underlying documentation supporting a prima facie case. CPLR 3215(f).  Because the affidavit of merit is often the only evidence of the

prima facie case presented in the default judgment application, it is particularly important that the information it contains be accurate.

The Civil Court clerk's office is responsible for processing default judgment applications in consumer debt cases in New York. CPLR 3215(a). The clerks ensure that the applications comply with a checklist, which includes an affidavit of service and an affidavit of merit "from a person with personal knowledge of the facts." New York City Civil Court, Entering Civil Judgments: Judgment Checklist, New York State Unified Court System.[6] If all the documents on the checklist are provided, the clerk awards the default judgment. *No judge ever reviews the case*.

C.    **The Scheme**

1.    **The Joint Venture**

In 2004, Mel Harris and Leucadia formed a joint venture to purchase and collect debts. JA162. Bypassing traditional collection methods, they decided to focus their efforts on filing lawsuits and obtaining judgments as quickly as possible. JA140-1; AA157-8 ¶ 9. Under the agreement, Leucadia would provide the capital, Mel Harris would represent the plaintiff in every court case, and they would split the profits. JA141, 146, 162. Through Leucadia's wholly owned

---

[6] Available at http://www.nycourts.gov/COURTS/nyc/civil/judgments_atty.shtml#checklist (last visited Nov. 6, 2013).

subsidiary L-Credit and an entity comprised of Mel Harris employees, they formed

LR Credit, LLC.  JA326, 943, 953.  This joint venture spawned the numerical LR

Credit entities, each of which would purchase a portfolio of alleged debts and act

as the plaintiff in the ensuing lawsuits.  SA4; JA140-46 ¶¶ 1, 3–7, 91.  Because

they exclusively purchase portfolios from other debt buyers, as opposed to directly

from original creditors, they can rarely, and perhaps never, obtain the

documentation needed to support their claims in a contested proceeding.

Defendants established automated litigation procedures that were

laser-focused on obtaining default judgments in the shortest amount of time

possible.  Mel Harris created computerized systems to import data and generate

summons and complaints, which were routed to attorneys for signature, bundled in

batches of 50, and assigned to a process serving agency.  AA157 ¶ 6.  After

process is allegedly served, the process serving agency sends Mel Harris an

electronic affidavit of service; 35 days after the date of alleged service, the Mel

Harris computer system automatically generates an application for default

judgment.  AA157-58 ¶¶ 8-9.  These computer databases are designed to

efficiently, and uniformly, process a high volume of debt collection lawsuits.  They

contain the amount of money collected from class members in an easily

identifiable manner.

Central to the scheme was the preparation and filing of uniform, fraudulent affidavits of merit in each and every case. Every affidavit of merit Mel Harris filed in support of a default judgment for LR Credit misrepresents that the affidavit is based on personal knowledge of the underlying accounts. Specifically, in each affidavit, Defendant Fabacher, who is the Information Technology Director at the Mel Harris law firm, and *also* the custodian of records for all the LR Credit entities, swears that he is "fully and personally familiar with, and [has] personal knowledge of, the facts and proceedings relating to the within action."[7] SA7-8; SA10. There is no dispute, however, that Fabacher has never viewed the underlying contract or agreement, a statement, a payment, or any of the original creditor's contemporaneous business records for these accounts. SA9; JA971, 981, 983. Rather, he admits to viewing only the data fields contained in spreadsheets compiled by the original creditor solely for the purpose of selling the accounts. JA438, 979. His "verification" process consists solely of ensuring that each data field contains a properly formatted entry; it does not (and could not) confirm the accuracy of the information contained in the data field. JA439, 978.

Fabacher testified during his deposition that he has no independent knowledge of the accounts purchased, and instead relies exclusively on the

---

[7] Although Defendants allege that their uniform practice has changed, the record contains no such evidence.

information provided by the original creditors to the companies that resold the

debts to Defendants:

> Q.    So you're saying that [in affirming that a retail charge account agreement was executed by the consumer in a particular case] you are relying on what the bank told you?
>
> A.    Absolutely.  Unequivocally.
>
> …
>
> Q.    So the basis for th[e] statement [that the consumer agreed to the terms of the retail charge agreement] is you're relying on what was told you by the original creditor or by the company that you purchase the debt from?
>
> A.    That is correct. . . . and through my import of the data, the validation of data, I consider that personal knowledge.
>
> …
>
> Q.    The basis for your statement [] that the Defendant incurred charges by the use of the account, you're relying on the fact that the entity you purchased the debt from told you that the Defendant incurred charges?
>
> A.    Absolutely.
>
> …
>
> Q.    You said that account statements were remitted to the Defendant[]. . . . What is the basis for that statement?
>
> A.    My understanding is that all retail charge agreements are required by federal law to remit statement every 30 days under the Federal Banking – this was my understanding.  The basic research I did before I signed [the affidavit of merit].  This is the early days of the

internet and they were required to remit statement on a 12 times a years, on all retail charge agreements. . . .

Q.    So the basis of this statement is number one, a general understanding that credit grantors . . . mail statements 12 times a years?

A.    Required I actually believe.

Q.    And a warranty that was made to you as part of a sale that statements were sent?

A.    That is correct.

Q.    But you actually have no idea whether statements were sent in a particular case?

A.    That is not necessarily so.  I don't know if I would say yes or no on this one.  Again, I don't have any knowledge that the statements were not sent. . . .

. . .

Q.    When you say that a certain amount is owed, you're relying on the amount that was given to you by the entity that sold you the debt?

A.    In the electronic file?

Q.    Yes.

A.    Yes.

JA970-74.  However, as discussed, in purchase and sale agreements, original

creditors specifically disclaim the reliability of this information.[8]

---

[8] The purchase and sales agreements in this case have similar disclaimers.  Because they were not introduced to Judge Chin as part of class certification briefing, they are not part of the record on appeal.

14

A typical spreadsheet lists thousands of purported accounts. JA437. Yet in the approximately 10 years Fabacher had worked at Mel S. Harris and Associates, his "verification" process caused only a single purchased account to be rejected—because a social security number contained seven digits instead of nine. JA440. The Mel Harris databases are designed solely to filter out defective data. JA438-39. There is no mechanism in place for verifying that the data itself is accurate. JA439.

Accordingly, Defendant Fabacher admits to lacking personal knowledge of the information set forth in his affidavits. As Judge Chin noted in his certification decision, and as Defendants brashly admit in their briefs, Defendant Fabacher read only one out of every 50 affidavits. SA10. He did not even bother looking at the other 49, despite signing every one. On average, he signed 350 affidavits of merit every week for LR Credit entities alone. *Id.*

### 2.    Samserv

To ensure a high default rate, Mel Harris/Leucadia primarily employed process servers who failed to serve the Summons and Complaint, a practice known as "sewer service." They directed more business to Samserv than any other agency. AA160 ¶ 4. As Judge Chin found in granting class certification, Samserv's records are rife with errors that are not minor or merely typographical.

SA6-7. Rather, they indicate deliberate deceit that corroborates the named

Plaintiffs' claims of never being served and infects every claimed act of service.

Between January 2007 and January 2011, the Samserv Defendants

performed service of process in 59,959 cases filed in New York City Civil Court

by Mel Harris/Leucadia. SA6. A mere six individual process servers accounted

for 79% of all affidavits of service filed by Samserv in Mel Harris/Leucadia cases.

AA162. Based on only a small sample size of the total cases, Defendants' records

reveal hundreds of instances of the same process server executing service at two or

more locations at the same time. SA6-7; AA162 ¶¶ 9–10. Twenty-three of

twenty-five servers who reported serving in New York City logged simultaneous

visits at different addresses. AA162 ¶ 9. Defendants Mosquera, Lamb, and

Andino alone claimed to have performed service in two or more places at the same

time on 517 occasions. SA6; AA162 ¶ 11. For example, Mosquera claimed to

have performed service at four different locations at 1 p.m. on September 17, 2008

and Andino claimed to have performed service at nine different locations at 4 p.m.

on March 29, 2007. SA7; AA162 ¶ 10. On many other occasions, multiple acts of

service were purportedly made so close in time that it would have been impossible

for the process server to travel to the various locations claimed.  SA7; AA163-5 ¶¶ 13–23, AA169-82.[9]

There are countless other defects in Defendants' records which, taken together, undermine the integrity of Samserv's records of alleged service.  In 2,915 instances, a process server claimed to have attempted or completed service *before* the date the task was even assigned.  AA163 ¶ 12.  Strings of visits scheduled along particular routes also commonly reflected nonsensical backtracking.  AA163-5 ¶¶ 16-23.

In addition, Samserv's electronic records contain implausibly high volumes of alleged service.  Their process servers routinely made more than 60 different service attempts in a single day, whereas a legitimate process server could not regularly make more than 25 service attempts in that time.  AA183; AA148 ¶ 6; AA153-4 ¶ 8.  And the rate at which each process server used a method of service varied wildly for no apparent reason.[10]  For example, even though they

---

[9] Samserv incorrectly characterizes these significant findings as an "error rate" of 1%.  *Compare* Samserv Br. at 11-12 *with infra* Argument IV (rebutting this claim).

[10] Under New York law, a process server plaintiff must try to serve the defendant with summons and complaint personally or by substitute service, which entails both giving the papers to "a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person to be served" and mailing the summons and complaint to the person's last known residence or actual place of business.  CPLR 308(2).  A process server may use the "nail and mail" method only after employing "due diligence" to affect personal or substitute service.  CPLR 308(4).  "Nail and mail" entails "affixing the summons to the door

served the same types of cases in the same geographic area, Defendants Mosquera and Lamb claimed to use substitute service (which requires finding a person at the defendant's home) in more than 90% of cases, whereas Defendant Andino claimed to employ "nail and mail" service (which requires finding nobody at home on at least three occasions) in 80% of cases. AA165-6 ¶ 26. Furthermore, while legitimate process servers typically serve people by personal and substitute service at a roughly equal ratio, Samserv's process servers reported substitute service in 69% of cases and personal service in only 3.5% of cases. AA166 ¶ 27; AA153 ¶ 5; AA148 ¶ 5.

This rampant deceit should come as no surprise, however, given the incentives created by the pay scale imposed by Mel Harris/Leucadia. The Samserv records show that payments to process servers for each individual service were unusually low—$6.50-$10 for each *completed* service. AA166 ¶ 29. Process servers were not paid when they reported that the address was not valid, the defendant had moved, the defendant was at a new address, the defendant was not known at the service address, the service address was a post office box, or the service address lacked an apartment number. In 95% of cases, process servers reported an outcome for which they would be paid. *Id.* ¶¶ 30-31; AA154 ¶ 10.

---

of either the actual place of business, dwelling place or usual place of abode" of the person and mailing the summons and complaint to the person's last known residence or actual place of business. *Id.*

### 3.    The Targets

#### a.    Class Representatives

New York City residents Monique Sykes, Rea Veerabadren, Kelvin Perez, and Clifton Armoogam are the named Plaintiffs.  The Leucadia and Mel Harris Defendants commenced lawsuits against each named Plaintiff in New York City Civil Court.  AA4-7, 8-9, 13-14, 17-18, 21-22.  The suits respectively alleged that Ms. Sykes, Ms. Veerabadren, Mr. Perez, and Mr. Armoogam owed money to one of the Defendant LR-Credit entities as an assignee and purchaser of a debt originally owed to an unrelated entity.  Defendant Samserv prepared affidavits that were filed in court, attesting that the named Plaintiffs had been served with process via "substituted" service when they had not.  *Id.* JA540, 587-90, 597-98.

The Leucadia and Mel Harris Defendants sought default judgments against Ms. Sykes, Ms. Veerabadren, Mr. Perez, and Mr. Armoogam.  In support of their motions, they submitted fraudulent affidavits of service prepared by the Samserv Defendants and fraudulent affidavits of merit from Defendant Fabacher claiming that he was "fully and personally familiar with, and [had] personal knowledge of, the facts and proceedings relating to the within action."  *Id.*  AA10, 15, 19, 23.

19

In reliance upon these fraudulent affidavits, court clerks entered default judgments against Ms. Sykes, Ms. Veerabadren, Mr. Perez, and Mr. Armoogam. *Id.* AA11-12, 16, 20, 24.

### b.    Class Members

All class members are victims (or future targets) of the same scheme by Defendants. All had the misfortune of having their names, or similar names, appear on a list of purported debts purchased by the Leucadia and Mel Harris Defendants for pennies on the dollar. All have had (or in the future will have), default judgments entered against them based on fraudulent affidavits of merit falsely alleging personal knowledge that a debt is owed, and affidavits of service falsely claiming process was served.

### 4.    Class Relief

On behalf of the Plaintiff Class, the named Plaintiffs bring FDCPA, RICO, and GBL § 349 claims against all Defendants, and a JL § 487 claim against the Mel Harris Defendants. Plaintiffs also seek critical injunctive and other equitable relief designed to prevent Defendants from continuing their illegal activities and to disgorge the large sums of money their scheme has generated. Finally, Plaintiffs seek compensatory damages to return them to the positions they were in before the fraud occurred, as well as statutory and treble damages as provided under the law.

## II.    STATEMENT OF THE CASE

Plaintiffs commenced this action on October 6, 2009.[11] On December 29, 2010, Judge Chin denied Defendants' motions to dismiss, holding, among other things, that Plaintiffs had stated claims under the FDCPA, RICO, and state law that did not run afoul of the *Rooker-Feldman* doctrine. *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 429 (S.D.N.Y. 2010). Plaintiffs then moved to certify the class and, on March 16, 2011, filed their Third Amended Class Action Complaint (TAC). On September 4, 2012, the District Court granted the motion to certify the class. SA1-42. It correctly reasoned:

> [Plaintiffs'] overarching claim is that defendants systematically filed false affidavits of merit and, in many instances, false affidavits of service to fraudulently procure default judgments in New York City Civil Court. Whether a false affidavit of merit or a false affidavit of service or both were employed in a particular instance, the fact remains that plaintiffs' injuries derive from defendants' alleged unitary course of conduct, that is, fraudulently procuring default judgments. Thus, plaintiffs have identified a unifying thread that warrants class treatment.

---

[11] On April 18, 2011, pursuant to Fed. R. Civ. P. 68, judgments were entered in favor of Plaintiffs Ruby Colon, Fatima Graham, Saudy Rivera, Paula Robinson and Enid Roman in the amount of $15,000 for each Plaintiff, together with reasonable costs and attorneys' fees.

SA25 (internal citations and quotations omitted).  The court certified a 23(b)(2)

class for injunctive relief under RICO, GBL, and JL and certified a 23(b)(3) class

for damages under the FDCPA, RICO, GBL, and JL (collectively the "Class").

The Leucadia and Mel Harris Defendants then obtained new counsel,

who attempted to relitigate the certification decision during the normally routine

task of agreeing to a certification order in accordance with Judge Chin's opinion.

Among other things, Defendants re-raised *Rooker-Feldman* and sought to exclude

from the available damages compensation the money that Defendants forcibly

extracted from Plaintiffs by fraud—an issue that had not been raised previously.

By Order filed March 28, 2013, Judge Chin rejected this backdoor attempt to re-

litigate the certification decision, and adopted Plaintiffs' proposed certification

order.  SA43-47.  In doing so, Judge Chin made clear that the mere presence of

individual issues does not undermine his finding that common issues predominate,

regardless of whether this particular measure of damages (compensation for money

taken after judgments were entered) later became available to Plaintiffs.  SA43.

He also reiterated that *Rooker-Feldman* does not bar Plaintiffs' claims, which are

independent of the state-court judgments, even if "those claims purportedly are

contrary to a legal conclusion that a state court has reached."  SA43-44.

On April 10, 2013, all three sets of Defendants filed petitions seeking interlocutory appeal under Fed. R. Civ. P. 23(f).  On July 19, 2013, leave to appeal was granted.  This appeal followed.

## SUMMARY OF ARGUMENT

This Court should reject Defendants' request to tamper, on interlocutory review, with Judge Chin's well-reasoned 40-page decision granting class certification.  The District Court did not abuse its discretion.

**I.**    The District Court appropriately granted a Rule 23(b)(3) class concerning the affidavits of merit.  The affidavits of merit are uniquely suited to class treatment because of the uniform nature of Defendants' practices.  Whether these affidavits of merit are fraudulent and give rise to liability under the FDCPA, RICO, GBL and JL are the essential questions driving this litigation, as Judge Chin found.  SA25, 36.

Defendants' scheme used fraudulent affidavits to convert basically worthless allegations that debts are owed, backed by no substantiation, into default judgments against every member of the Class.  The scheme's success caused an injury common to every member of the Class: a default judgment that exceeded the amount of the alleged debt (due to statutory fees and costs).

Defendants cannot reorient Plaintiffs' claims to elide the importance of the false affidavits of merit; Plaintiffs are the masters of their Complaint.  The

focus on the affidavits of merit, whose uniformity begs for class treatment, is appropriate. While the facts presented here (as detailed below) permit class-wide resolution of service issues, even if they did not, affirmance would be required because Plaintiffs can obtain full recovery by proving that the affidavits of merit, alone, were fraudulent.

As the District Court held, in a finding entitled to deference, "the common issues of law and fact presented in this litigation predominate over any individual ones," making certification under Rule 23(b)(3) appropriate. SA36.

Defendants' novel "no harm, no foul" defense, seeking to excuse their fraud because some victims of the scheme may have owed the underlying debt, does not defeat certification, as the District Court appropriately held. Otherwise, Congress's consumer-protective FDCPA scheme would be turned on its head. And under black-letter legal principles, Defendants have no right to engage in "self help" to lie to state courts in the service of obtaining money they claim is due.

Damages inquiries do not defeat predominance here: statutory damages are fixed, the exact amounts of money Defendants extracted are in Defendants' own computer records, and any small individualized incidental damages do not defeat predominance under well established Second Circuit law. Not only is the validity of the debt not relevant to damages, but even if it were,

Defendants could not prove the debt in more than a *de minimis* number of cases, which cannot defeat predominance.

Defendants' forum and full faith and credit arguments must be rejected because forum is a geographical concept, not an opportunity to rewrite federal jurisdiction. Fraud is a well established exception to full faith and credit requirements.

The affidavits of service are also amenable to class-wide resolution, because Defendants have no admissible evidence to support their allegations of proper service in the wake of the rampant deceit in the process serving records.

Samserv is an appropriate class action defendant because each and every class member has a RICO claim against Samserv.

**II.**     The District Court appropriately certified a Rule 23(b)(2) class because Defendants have engaged in a course of conduct applicable to the class as a whole, and the injunctive relief sought will benefit each and every member of the class.

**III.**     Under *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013), the District Court appropriately resolved only those questions that bear on the propriety of certification. Defendants highlight three unanswered questions, none of which is appropriate for resolution at this stage, but all of which ultimately should be resolved in Plaintiffs' favor:

(i) **Rooker-Feldman:** The *Rooker-Feldman* doctrine is narrow and only bars federal courts from reviewing state court judgments. It has no applicability where, as here, Plaintiffs have no quarrel with the state court's actions but instead raise independent fraud claims that entitle them to money damages. If Plaintiffs succeed in this action, the default judgments will remain legally enforceable—until such time as they are vacated by the state courts.

(ii) **FDCPA:** The plain language of the FDCPA is broad, consistent with Congressional intent to protect consumers from debt collection abuse, and prohibits false statements to courts.

(iii) **Injunctive Relief Under RICO:** RICO's plain language, the intent of Congress to vest private parties with a broad set of remedies, and analogous text in other statutes that are construed to include injunctive relief offer persuasive evidence that private parties can seek injunctive relief under RICO.

## ARGUMENT

## I.    STANDARD OF REVIEW

The District Court's "decision to certify a class under Rule 23 [is reviewed for] for abuse of discretion, the legal conclusions that informed its decision *de novo,* and any findings of fact for clear error." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 116 (2d Cir. 2013). This review is "'noticeably'" more "'deferential'" where, as here, the district court has certified the class, as

26

compared to review of a denial of class certification. *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 224-25 (2d Cir. 2006) (quoting *Parker v. Time Warner Entm't Co.,* 331 F.3d 13, 18 (2d Cir. 2003)).  The question whether common issues predominate over any individualized issues in a Rule 23(b)(3) analysis is a factual finding reviewed for abuse of discretion and/or clear error. *U.S. Foodservice*, 729 F.3d at 117; *see also Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.,* 866 F.2d 228, 233 (7th Cir. 1988) ("To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must, as one member of this court recently stated during oral argument, strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.").

## II.    RULE 23(A) IS SATISFIED BECAUSE PLAINTIFFS' CLAIMS ARISING OUT OF THE AFFIDAVITS OF MERIT ARE APPROPRIATE FOR CLASS TREATMENT

### A.    Defendants Mischaracterize the Class's Claims

Defendants' appeal relies on a fundamental mischaracterization of the Class's claims.  Plaintiffs have never "focused on Samserv's allegedly deficient service" to the exclusion of the affidavits of merit, despite Defendants' contention. *Cf.* Mel S. Harris (MSH) Br. at 2.  To the contrary, Plaintiffs have alleged that Defendants' scheme involved a one-two punch: (i) sewer service (false affidavits of service) to ensure class members never appeared to contest the charges against them, because Defendants could not win contested judgments; and (ii)

misrepresentations to the state-court clerk (false affidavits of merit) in order to obtain default judgments.

Plaintiffs have never contended that they need to prove that *both* affidavits were fraudulent for every member of the Class to succeed on their legal claims. To the contrary, Plaintiffs consistently alleged that submission of the affidavits of merit was a uniform fraudulent practice that alone sufficed to demonstrate Defendants' liability, with the fraudulent affidavits of service an additional—and independently actionable—fraud. *See, e.g.*, JA207 ¶ 351(c)-(d) (listing FDCPA violations specific to false and deceptive affidavits of merit); *id.* JA210 ¶ 362(c)-(d) (same for civil RICO); *id.* JA211 ¶ 365(c)-(d) (same for NY GBL); *id.* JA218 ¶ 392(c)-(d) (same for NY Judiciary Law); *id.* "Wherefore" Clause (seeking as relief, *inter alia,* order directing Defendants to "file affidavits of merit in future actions that truthfully and accurately reflect their personal knowledge of the facts, or lack thereof"). As Defendants concede, Plaintiffs "are masters of their complaint." MSH Br. at 2.

Given that successfully proving that the default judgments were issued due to fraudulent affidavits of service *or* due to fraudulent affidavits of merit suffices for a judgment in the Class's favor, there was nothing improper in the focus on the affidavits of merit for purposes of class certification. A district court is tasked with determining whether there are common issues that are

amenable to class-wide resolution before certifying a class. In so analyzing, Judge

Chin appropriately concluded that he did not have to decide whether the service

issues could be resolved class-wide (though he noted that there was "substantial

support" that "defendants regularly engaged in sewer service," SA7), because the

centrality of the affidavits of merit "overcome" any potential distinctions related to

service. SA28. This does not constitute "rewrit[ing] the substance of plaintiffs'

claims," MSH Br. at 2, but is rather a factual determination that the "overarching

claim is that defendants systematically filed false affidavits of merit," SA25. This

factual determination is entitled to deference by this Court.

### B.    The Fraudulent Affidavits of Merit Are Actionable Regardless of Whether Class Members Were Actually Served

The Class is entitled to relief if a jury finds that *either* the affidavits of

service *or* the affidavits of merit were fraudulent. Both affidavits were necessary

to obtain a state court default judgment; each caused the same harm: the default

judgments Defendants execute against.

Defendants could not have obtained a default judgment without the

affidavits of merit: like all civil plaintiffs, debt buyers have the burden of proof.

Under New York Law, a party seeking a default judgment must submit both "proof

of service of the summons and the complaint  .  .  . and proof of the facts

constituting the claim, the default and the amount due by affidavit made by the

party." CPLR 3215(f). The court will not issue a judgment simply because a defendant is properly served and fails to appear. *See Beaton v. Transit Facility Corp.*, 14 A.D.3d 637, 637-38 (N.Y. App. Div. 2005). Instead, state law requires that every judgment be supported by valid evidence of a prima facie case. *See id.*; CPLR 3215(f).

To comply with this state requirement, the Mel Harris Defendants filed facially valid—yet false—affidavits of merit in every case. As the District Court found, "Fabacher signs hundreds of affidavits [of merit] a week, purportedly based on personal knowledge, purporting to certify that the action has merit without actually having reviewed any credit agreements, promissory notes, or underlying documents, and, indeed, without even reading what he was signing." SA11. Not only has Fabacher not *reviewed* the underlying documents, Defendants do not possess a single document to support their allegations when they seek a default judgment—no account agreements, no account statements, no proof that there "remains due and owing an unpaid *agreed* balance of" a sum certain, as the affiant claims. AA10; AA15; AA19; AA23 (emphasis added). Defendants possess only a spreadsheet with minimal information concerning the alleged debt, and Defendants are contractually limited (or precluded altogether) from obtaining documentation to prove the purported debts are valid. Nor can Defendants rely on these barebones spreadsheets: the debts were sold to them with specific disclaimers

that the information in the spreadsheets may be inaccurate, and such data are rife with errors.

Defendants further claim that Judge Chin held that Fabacher's affidavit would have been sufficient to support the entry of default judgments had it been based "on information and belief."  Judge Chin made no such finding, nor is that a fair statement of the law.  *Cf.* MSH Br. at 2.  Judge Chin noted only that Defendants cited a case concerning an affidavit of merit with "information and belief" statements, which Judge Chin held confirmed that "this is a legal issue—common to the proposed class."  SA26-27 n.9.  On the merits, the resolution of that legal issue is clear: to support entry of a default judgment, New York law requires an affidavit from a party who has personal knowledge of the facts of the case. CPLR 3215(f); *Woodson v. Mendon Leasing Corp.*, 790 N.E.2d 1156, 1162 (N.Y. 2003); *Zelnik v. Bidermann Industries U.S.A.*, 662 N.Y.S.2d 19, 19 (1st Dep't 1997) ("Plaintiff's affidavit of merit on this claim is deficient because it is wholly on information and belief, without the slightest reference to the source of the information or the grounds for the belief.").  And "no judgment, even in a small claims action, can rest entirely on hearsay evidence."  *Bidermann,* 662 N.Y.S.2d at 19.

Mel Harris contends that filing affidavits of merit without the immediate means of proving a debt is not a violation of the FDCPA, citing *Harvey*

*v. Great Seneca Financial Corp.*, 453 F.3d 324, 333 (6th Cir. 2006).  MSH Br. at

37 n.4.  This merits argument is inappropriate at the class certification stage.  It is

also wrong.  As explained *infra*, Fabacher's affidavit is false because he claims to

have personal knowledge that he does not, in fact, have.  Furthermore, it is

misleading because, by declaring himself familiar with "records maintained by and

obtained by plaintiff's assignor," JA165, Fabacher implies that he has access to

records from the original creditor that support the substantive assertions in his

affidavit, such as that a contract was breached, statements were mailed, etc.  In

reality, however, Defendants had no such access, and the records available to

Defendants did not and could not support Fabacher's assertions.  As the District

Court recognized, this case is not like *Harvey*, but rather like the cases in which a

debt collector files a lawsuit without the ability ever to prove the debt.  *See* JA117-

18; *Harvey*, 453 F.3d at 333.[12]

––––––––––––––––––––

[12]  Other courts have found that such allegations could state a claim under the
FDCPA.  *See, e.g.*, *Mello v. Great Seneca Financial Corp.*, 526 F. Supp. 2d 1020,
023 (C.D. Cal. 2007) (refusing to dismiss allegations that debt collector violated
FDCPA by filing suit without the intent or ability to obtain evidence of the debt);
*Kuria v. Palisades Acquisition XVI, LLC*, 752 F.Supp.2d 1293 (N.D. Ga. 2010)
(denying motion to dismiss where plaintiff alleged that debt collection agency
engaged in a practice of filing coercive debt collection lawsuits that it could never
prove).  *Mansfield v. Midland Funding, LLC*, 09CV358 L WVG, 2011 WL
1212939 (S.D. Cal. Mar. 30, 2011), another case cited by Mel Harris, is inapposite,
as it focuses on the defendant debt collector's alleged failure to conduct pre-suit
investigation as to whether the underlying debt is time barred, rather than the
conduct engaged in by Mel Harris (filing affidavits of merit misrepresenting its

Fabacher's false attestations of personal knowledge are *critical* to Defendants' ability to obtain default judgments. As noted, the New York City Civil Court has issued a "Judgment Checklist" for clerks to consult when processing applications for default judgments. The checklist requires that the application contain an "Affidavit of Facts from a person *with personal knowledge of the facts*." (Emphasis added). Fabacher's affidavits mislead state court personnel into believing that Mel Harris/Leucadia have met the statutory requirements for obtaining a default judgment, when in fact, they have not and cannot meet those requirements. The state court clerk reviews the affidavit of merit, and because it appears facially valid, issues a judgment. [13]

Even if certain Class members were actually served with process, they were injured in the same way as those who were not served: all class members suffered from a default judgment which would not have been issued but for

_____

level of knowledge and proof).

[13] Defendants ignore this checklist and instead point to a N.Y.C. Civil Court directive to buttress their claim. *See* LUK Br. at 15; MSH Br. at 13, 17. But the directive itself states that the affidavits required therein must be submitted in "addition to," not instead of, the affidavits on personal knowledge required by the CPLR and binding case law. *See* N.Y.C. Civil Ct. Directive DRP-182 (May 2009). Further, these directives are not approved by the legislature or the courts, but rather are issued by the administrative judge in her capacity as administrator and supervisor of the day-to-day operations of the civil court. *See* NY Const. VI, § 28; 22 N.Y.C.R.R. § 81.1(b)(1), (4), (6) and (8); *Matter of 367 E. 201st St. LLC v. Velez*, 917 N.Y.S.2d 814 (Sup. Ct. 2011). To the extent that the directive conflicts with the CPLR and case law it is unlawful and must be disregarded.

Defendants' fraudulent affidavits of merit.[14]  And all class members are entitled to

a finding of liability on each of their legal claims based on the fraudulent affidavits

of merit, regardless of the resolution of the affidavits of service.[15]

      For that reason, Plaintiffs' claims based on false affidavits of merit are

completely independent of their claims based on false affidavits of service.  The

fraudulent affidavits of merit alone entitle the Class to judgment in their favor,

regardless of whether any individual member of the Class was actually served

(and, as detailed below, a jury can find that there is no proof that anyone was

served, *see infra* IV).

---

[14]  Equally irrelevant is whether certain class members received notice from the Civil Court or a mailing from Mel Harris that a lawsuit had been initiated.  *See* MSH Br. at 31; Samserv Br. at 9 n.6.  This notice does not cure the lack of proper service.  The Civil Court rule requiring mailing of this notice presupposes that proper service of the summons and complaint has already occurred.  *See* N.Y.C. Civil Court Rules 208.6(h).  In addition, it is black-letter law that a simple mailing does not substitute for personal service.  *Cf.* CPLR 308 (dictating that mailing is only sufficient for service when coupled with substitute service or notice affixed to door).  Nor does the mailing of an "additional" notice affect the fundamental question of whether the affidavits of merit were false, or cure Defendants' fraudulent affidavits of service claiming that service occurred when it did not.  The only plausible relevance of the additional notice is that a person who obtained a mailing may not invoke equitable tolling; but the Class has disclaimed any claims based on equitable tolling.  *See infra* at III.D.

[15] Judicial estoppel is inapplicable here because there is nothing inconsistent, let alone "clearly inconsistent," between the reality that the false affidavits of service were critical to Defendants' enterprise, and an argument that liability can be established based on the false affidavits of merit alone.  *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010).

### C.    The Affidavits of Merit Were Executed as Part of Defendants' Uniform Practice and Raise Common Questions

As Judge Chin held, "there is a central issue as to the veracity of the affiant's [Defendant Todd Fabacher's] uniform statement of 'personal knowledge' of the underlying debt." SA26. Whether these sworn statements are fraudulent can be resolved on a class-wide basis. Commonality requires only a "single common question" that unites the proposed class. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2556 (2011); *Friedman-Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 155 (S.D.N.Y. 2010) ("A single common issue of law may be sufficient to satisfy the commonality requirement" where the common question is "at the core of the cause of action alleged." (internal citations and quotation marks omitted)); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 276 (S.D.N.Y. 2008) (commonality requires "a common thread" that unites).

As Judge Chin found, Defendants' practices are materially identical for each class member. SA25, 35. "Where plaintiffs allege that class members have been injured by similar material misrepresentations and omissions, the Commonality Requirement is satisfied." *In re Alstom SA Sec. Litig.,* 253 F.R.D. 266, 276 (S.D.N.Y. 2008); *see also Romano v. SLS Residential Inc.,* 246 F.R.D. 432, 444 (S.D.N.Y. 2007) ("Where, as here, a plaintiff alleges injury from a common policy, the commonality requirement is met"). "Collective adjudication" of the question whether Defendants violated the FDCPA, RICO, GBL and JL by

submitting these materially identical affidavits would ensure "uniformity of decision as to similarly situated parties," and prevent the inefficiencies that would occur if "many nearly identical litigations" were necessary to resolve "these same questions." *In re Nassau*, 461 F.3d at 228.

Here, the common thread is that Defendants procured a default judgment in New York City Civil Court against each and every class member by submitting materially identical, and fundamentally false, affidavits of merit to the court. Because a judgment of liability can be entered against Defendants based solely on their uniform practice of using illegal affidavits of merit, thus giving rise to various forms of relief under the invoked statutes, Rule 23(a)(2) is more than satisfied.[16]

### D.  Class Members Have Suffered a Common Injury

#### 1.  The Judgment Is Itself an Injury, Regardless of Whether the Debts Were Owed

In a misplaced attempt to manufacture individualized issues, Defendants claim that a person who owes a debt is not injured by a fraudulently obtained default judgment. This attempt must fail. As Judge Chin found, "plaintiffs' injuries derive from defendants' alleged 'unitary course of conduct,' that is fraudulently procuring default judgments." SA25 (quoting *Marisol A. v.*

---

[16] For the reasons outlined in this section, the District Court's finding of typicality is similarly correct.

*Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997)).  This injury is common to each and

every member of the class, regardless of whether they owe the underlying debt.

First, there is a concrete financial cost attendant to the default

judgments.  Defendants sought and obtained, in every case, a default judgment

amount that *exceeded* the amount of the original debt.  The default judgments

included court fees, filing fees, enforcement fees, and statutory costs.  *See, e.g.*,

AA24.  All class members thus share a common injury: judgments that included

various fees, over and above any underlying debts, imposed as a result of

Defendants' deception and fraud.  This certainly suffices to constitute injury to

property under RICO and the GBL.  *See Canyon Cnty. v. Syngenta Seeds, Inc.*, 519

F.3d 969, 976 (9th Cir. 2008) ("In the ordinary context of a commercial

transaction, a consumer who has been overcharged can claim an injury to her

property, based on a wrongful deprivation of her money.") (citing *Reiter v.

Sonotone Corp*., 442 U.S. 330, 342 (1979)); *Ellis v. J.P. Morgan Chase & Co.*, No.

12-CV-03897, 2013 WL 2921799, at *19 (N.D. Cal. June 13, 2013) (payment of

marked-up fees constitutes injury to property under RICO); *Oswego Laborers'

Local 214 Pension Fund v. Marine Midland Bank, N.A.*,  623 N.Y.S.2d 529, 533

(1995) (plaintiff must prove "actual" injury, but not necessarily pecuniary harm).

Even beyond these statutory fees, Defendants injured class members

by obtaining default judgments against them via fraud.  The entry of a judgment is

vastly different, and much more harmful, than simply owing a debt. Defendants'

fraud enabled them to convert something with little value—an unsubstantiated debt

—into something highly lucrative—a default judgment that could be executed

against. And once those default judgments were issued, all class members suffered

from the common injury of the negative credit effects of a default judgment (and

many also faced execution of the judgments in the form of wage garnishment and

bank liens). The concrete injury from a default judgment exceeds any harm that

exists from a tenuous, alleged debt that cannot be collected.

### 2.    Defendants' Fraud Is Actionable Regardless of Whether Class Members May Owe an Underlying Debt

At bottom, Defendants' argument boils down to a claim that they may

commit perjury and fraud against people who allegedly owe them money.

Unsurprisingly, Defendants cite no support for this distasteful proposition. As

Judge Chin found, the case law is clear that FDCPA claims exist even if the debt is

valid. Basic legal principles dictate the same result for Plaintiffs' other claims.

### a.    FDCPA Claims Are Actionable Regardless of Underlying Debts

Plaintiffs' possess actionable, common FDCPA claims regardless of

whether some members of the class may owe the debt. In rejecting Defendants'

claim that typicality was destroyed by "differences relating to the underlying

debts," Judge Chin concluded that "the validity or existence of the underlying

debts are not at issue here.  Liability under the FDCPA can be established

irrespective of whether the presumed debtor owes the debt in question."  SA31.

Judge Chin rightly concluded that none of Plaintiffs' claims require

proof that the amounts sought in the state court actions were not owed.  The

pertinent issue is not whether a debt was owed, nor whether Defendants may, at

some point, be capable of ascertaining proof of the underlying debt.  It is whether,

in seeking to collect on alleged debts, Defendants made false representations about

their knowledge when they submitted affidavits to courts.

Defendants' arguments would turn the FDCPA statutory scheme on

its head, and courts have consistently rejected every iteration of Defendants'

argument.  As the court in *Hamid v. Stock & Grimes, LLP*, explained:  "It is clear

from its underlying purpose that debtors may recover for violations of the FDCPA

even if they have defaulted on a debt.  It follows that debtors may recover the

amount paid to settle a debt, if the debt collector violated the FDCPA in making

the collection, as occurred here."  876 F. Supp. 2d 500, 503 (E.D. Pa. 2012).

*Hamid* decried the perverse incentives that would flow from the damages

limitation Defendants here propose:  "If [plaintiff's] payment was not a proper

element of actual damages under the FDCPA, a debt collector could harass a

debtor in violation of the FDCPA, as a result of that harassment collect the debt,

and thereafter retain what it collected."  *Id.*  "We do not believe that Congress

intended" a debt collector to "retain what it collected" as a result of violating the

FDCPA, *Hamid* concluded. *Id.*; *see Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir.

1998) ("[T]he FDCPA is designed to protect consumers from the unscrupulous

antics of debt collectors, irrespective of whether a valid debt actually exists. . . .

We must focus on the debt collector's misconduct, not whether the debt is valid.");

*McCartney v. First City Bank*, 970 F.2d 45, 47 (5th Cir. 1992) (holding that

plaintiff had stated FDCPA claim for unlawful entry of default judgment,

regardless of whether debt was owed); *Baker v. G. C. Servs. Corp.*, 677 F.2d 775,

777 (9th Cir. 1982) ("The [FDCPA] does not make an exception for liability . . .

when the debtor does in fact owe the entire debt."); *see also Krawczyk v. Centurion

Capital Corp.,* 06-C-6273, 2009 WL 395458, at *8 (N.D. Ill. Feb. 18, 2009) ("The

FDCPA was enacted by Congress to protect consumers who have been victimized

by unscrupulous debt collectors, regardless of whether there is a valid debt

owed.").

   In *Abby v. Paige*, 10-23589-CIV, 2013 WL 141145, at *8-9 (S.D. Fla.

Jan. 11, 2013), the court held that the plaintiff was entitled to compensation for the

moneys collected by defendants in violation of the FDCPA "[r]egardless of

whether Plaintiff owed these amounts."

   Similarly, courts will not allow FDCPA defendants to transform the

litigation of their misconduct into an attempt to collect the underlying alleged debt,

in the form of a counterclaim.  *See Sparrow v. Mazda Am. Credit*, 385 F. Supp. 2d 1063, 1071 (E.D. Cal. 2005) (declining to exercise supplemental jurisdiction over collection counter-claim because "[s]trong policy reasons exist to prevent the chilling effect of trying FDCPA claims in the same case as state law claims for collection of the underlying debt").

Finally, in *Isa v. Law Office of Timothy Baxter & Assocs.*, No. 13-cv-11284 (E.D. Mich. Oct. 21, 2013), Dkt. 19, the court found that the debt-collector defendant, after settling with a plaintiff who raised an FDCPA claim, could not pay the settlement amount to one of plaintiff's creditors.  The court reasoned: "Congress did not intend for collectors to engage in violations, enter judgments, and use state law on judgment execution to force payment to creditors."  *Id.* at 6. Allowing debt collectors to use wrongful practices in order to force payments of underlying debts would undermine the "very purpose of the FDCPA."  *Id.* at 6.

Clearly, FDCPA claims do not turn on whether a plaintiff owes an underlying debt, regardless of how the argument is framed.  All class members possess an actionable FDCPA claim regardless of whether some of them may owe the underlying debts.

      **b.**    **RICO, GBL, and JL Claims Are Actionable Regardless of the Validity of the Underlying Debts**

The same reasoning applies equally to the RICO, GBL, and JL claims. The issue of whether class members owe debts is irrelevant to the viability of those statutory claims and thus irrelevant to a commonality analysis.

Defendants attempt to distinguish between class members who may have owed a debt and those who did not by asserting, essentially, a "claim of right" to those debts. Defendants contend that their fraudulent conduct should be excused because they had a "claim of right" to debts owed, and thus, certain class members cannot be injured by judgments through which they were forced to pay those debts. That reasoning, however, has been thoroughly rejected in situations involving taking by wrongful means, such as here.

A "claim of right" to the underlying property is not a defense to fraud. In *United States. v. Gole*, 158 F.3d 166, 168 (2d Cir. 1998), this Court rejected a "claim of right" defense to the federal mail fraud statute, 18 U.S.C. § 1341. The defendant in *Gole* argued that his entitlement to pension benefits excused his overstatements of income to obtain the benefits. In rejecting this defense, the Court noted that, if this "theory of self-help were the law," individuals who believed they were legally entitled to a benefit, but concerned that they might not receive it, would have "carte blanche simply to lie to obtain those benefits." 158 F.3d at 168. The Court refused to "encourage people to lie to obtain benefits rather than pursue their rights in civil actions. Such controversies may be resolved by

42

civil suit or settlement, but cannot be won by using lies and deception." *Id.*; *see also United States v. Lauersen*, 98 CR. 1134 (WHP), 1999 WL 637237 (S.D.N.Y. Aug. 20, 1999) ("Once a mailing is made with the requisite fraudulent intent, the crime of mail fraud is complete. The Government need not further prove that . . . the defendant recovered more than that to which he was entitled." (internal quotation and alteration omitted)).

Similarly, under New York law, a claim of right is not a defense to extortion—where coercion or the threat of force is used to deprive someone of property. *People v. Reid*, 69 N.Y.2d 469, 476 (1987). Nor is it a defense to robbery—where actual force is used to deprive another person of property. *See United States v. Johnson*, 212 F. Supp. 2d 202, 211 (S.D.N.Y. 2002) (citing N.Y. Penal Law § 160.00 and *Lebron v. Mann*, 40 F.3d 561, 563 (2d Cir. 2004)).

The policy behind these cases, as others, is to deter individuals from engaging in "self help," where the line between permissible and illegal conduct is easily blurred. As one court has noted, "[S]trict application of the law [of self-help repossession] is necessary to prevent abuse and discourage illegal conduct." *Mauro v. General Motors Acceptance Corp.*, 164 Misc.2d 871, 874, 626 N.Y.S.2d 374 (Sup. Ct. Albany Cnty. 1995) (lawful right to the property does not excuse car repossession that results in breach of peace).

A claim of right is especially disfavored when self-help is used to seize money, as opposed to a unique item of personal property.   *Reid*, 69 N.Y.2d at 475; *see also People v. Green*, 841 N.E.2d 289 (N.Y. 2005) (defendant in *Reid* could not have true claim of right to fungible cash—the bills themselves—that he took to satisfy an alleged debt).   Accordingly, courts are least tolerant of deceptive or otherwise wrongful conduct to obtain money:

> The d[i]stinction between specific personal property and money in general is important.  A debtor can owe another $150 but the $150 in the debtor's pocket is not the specific property of the creditor.  One has the intention to steal when he takes money from another's possession against the possessor's consent even though he also intends to apply the stolen money to a debt.  The efficacy of self-help by force to enforce a bona fide claim for money does not negate the intent to commit robbery.  Can one break into a bank and take money so long as he does not take more than the balance in his savings or checking account? . . . [T]aking money from a debtor by force by pay a debt is robbery.  The creditor has no such right of appropriation and allocation.

*Edwards v. State*, 181 N.W.2d 383, 388 (Wis. 1970); *see also People v. Pagan*, 968 N.E.2d 960, 964 (N.Y. 2012) (when defendant takes a hundred dollars from an individual by force, without evidence suggesting that defendant cares about particular bills making up the hundred dollars, defendant does not have a good faith belief that bills are his own).

The victims of these wrongful takings suffered an injury, regardless of the validity of the claim of right.  In arguing that class members who owed an

underlying debt were not injured for purposes of their RICO, GBL and JL claims,

Defendants essentially argue that their "claim of right" to an underlying debt

excuses the fraudulent and improper means they used to force payment of the debt.

As many cases make clear, however, a creditor has no claim of right to money,

which is a fungible item, such that he may engage in wrongful taking to obtain it.

And in certain contexts, such as the use of fraud and deceit by Defendants here,

courts reject the availability of the claim of right defense.

Finally, allowing creditors to engage in self-help without providing a

means to challenge that conduct through RICO, GBL and JL claims would

encourage illegal conduct.  This Court should reject Defendants' suggestion that

their "claim of right" to the underlying debts supersedes class members' injuries.

Rather, each member of the class is entitled to be made whole, or

placed in the same position as if they had not been a victim of Defendants' fraud.

To achieve this result, the Defendants must compensate them for all the moneys

they extracted as a result of their fraud, which are Plaintiffs' out-of-pocket losses,

including fees, regardless of any claim that the debt was actually owed.  *See, e.g.*,

*U.S. Foodservice*, 729 F.3d at 122 ("Our case law is clear that damages as

compensation under RICO § 1964(c) for injury to property must, under the familiar

rule of law, place [the injured parties] in the same position they would have been in

but for the illegal conduct" (internal quotation marks and citation omitted, brackets

45

in original)); *Oswego Laborers' 214 Pension Fund v. Marine Midland Bank, N.A.*,
623 N.Y.S.2d 529, 533-34 (1995) ("a plaintiff seeking compensatory damages"
under the GBL must show that Defendants' "deceptive act or practice . . . caused
actual, although not necessarily pecuniary, harm"); 15 U.S.C. § 1692k(a)(1) (under
FDCPA defendant is liable for "any actual damage sustained" by plaintiff);
*Amalfitano v. Rosenberg*, 874 N.Y.S.2d 868 (2009) (discussing award of
compensatory damages in the form of out-of-pocket losses plus mandatory treble
damages under the JL).

### 3.  Issues of Service Do Not Affect the Injury Caused by the Entry of the Default Judgment

Defendants also err in claiming that those who were served were
injured distinctly from those who were not.  Leucadia (LUK) Br. at 20-21.  As
detailed above, even if a person is properly served, a debt collector cannot obtain a
default judgment without also submitting an affidavit of merit.  *See supra* III.B
(citing CPLR 3215).  Regardless of whether service was proper, no default
judgment would have issued—and thus the class member would have suffered no
injury—had the Mel Harris Defendants not also submitted a fraudulent affidavit of
merit.

The Mel Harris Defendants claim that a person who "chose to default
in court" suffers a distinct injury.  MSH Br. at 38.  To the extent they are implying
that a person who chose not to appear is conceding that a default judgment should

46

be entered in the amount of the complaint, that is erroneous. Parties to a lawsuit

enjoy the protection of court processes that ensure no default judgment is issued

without some proof of the claim. To the extent there are Class members who were

properly served, their damage was not caused by their failure to appear in court (as

the Mel Harris Defendants claim) but instead by the Defendants' decision to

submit fraudulent affidavits of merits; had no affidavits of merit been submitted,

failing to appear would have had no consequences. *Cf.* MSH Br. at 37. Damages

for those who may have been properly served, far from being "nominal," are all

moneys that were extracted as a result of the Defendants' fraudulent affidavits of

merit. *Cf.* MSH Br. at 38.

### E. Commonality is Satisfied Where Plaintiffs Identify Questions That Can Be Resolved on a Class-wide Basis

Defendants fault Judge Chin for finding that Rule 23(a)'s

commonality requirements were met, because Judge Chin did not *resolve* the

common questions at the class certification stage. Defendants argue that that a

district court cannot certify claims that "cannot succeed as a matter of law." LUK

Br. at 35. Requiring that common questions of law be resolved on the merits in

Plaintiffs' favor prior to class certification, as Defendants urge, is contrary to Rule

23 and Supreme Court precedent.

Rule 23 allows for class certification based on "*questions* of law"

(emphasis added) and requires only that such questions be "capable of classwide

resolution" – in other words, that a class-wide proceeding will "generate common answers apt to drive the resolution of the litigation."  *Wal-Mart*, 131 S. Ct. at 2551.[17]  Defendants point to a 2008 Second Circuit case, while improperly failing to cite the 2013 Supreme Court case squarely on point.  *Compare Amgen*, 133 S. Ct. at 1194-95 *with McLaughlin v. Am. Tobacco Co*., 522 F.3d 215, 228 (2d Cir. 2008).  In *Amgen,* the Supreme Court held that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent—but *only to the extent*—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  133 S. Ct. at 1194-95 (emphasis added).  The question the District Court must resolve at the certification stage is whether common questions predominate, not whether "those questions will be answered, on the merits, in favor of the class."  *Id.* at 1191.

Under *Amgen,* then, not only did Judge Chin not err by not resolving "merits questions," it would have been reversible error to engage in a "free-ranging

---

[17]  The text of the Rule clearly contemplates that some class actions will be certified on the basis of common questions of law (as opposed to questions of fact), which will then be resolved on the merits after certification.  Indeed, a rule that requires resolving all questions of law in plaintiffs' favor prior to class certification would render that part of the Rule superfluous, violating a cardinal principal of statutory construction.  *T.R.W., Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

merits inquir[y]."  *Id.* at 1194-95.[18]  A court should not resolve common questions at the certification stage so long as the Plaintiffs identify at "single common question" which can be answered on a class-wide basis and will "drive the resolution of the litigation."  *Wal-Mart*, 131 S. Ct. at 2551-52 (internal quotations omitted).  And, turning back to first principles that Defendants ignore, all questions need not be common; the mere existence of individualized inquiries itself does not defeat class certification.  *See U.S. Foodservice*, 729 F.3d at 118 (plaintiffs need not "prove that each element of [their] claim is susceptible to classwide proof"); *see also infra* at III.A (common questions predominate).  So long as one common question can be resolved on a class-wide basis, commonality is satisfied.  *Wal-Mart,* 131 S. Ct. at 2556.

Here, to take just one common question that generates common answers, the truth of Defendants' representations to the state courts about their personal knowledge of the debt can be resolved on a class-wide basis and will "drive the resolution of the litigation."  *Id.* at 2551 (internal quotations omitted).  And the questions regarding whether the relationship between the Defendants

---

[18]   While *Amgen* involved a dispute over predominance because defendants conceded commonality, "the same analytical principles" apply to a commonality analysis, which is a more lenient standard than predominance.  *Comcast Corp. v. Behrend,* 133 S.Ct. 1426 (2013).

constitutes an association-in-fact under RICO will similarly be resolved on a class-wide basis.

There are three additional common questions that Defendants fault Judge Chin for not already resolving on the merits: (1) whether the *Rooker-Feldman* doctrine bars plaintiffs from recovering, as damages, "money collected or paid out pursuant to any state-court default judgment," SA43; (2) whether the FDCPA bars the filing of false affidavits of merit in state court debt collection actions; and (3) whether RICO permits injunctive relief.

Each question is indisputably a common issue. Defendants do not even claim that the answers to these questions "are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 133 S.Ct. at 1195. To the contrary, if the FDCPA does not permit claims based on misrepresentations to a court, if RICO does not permit injunctive relief, or if damages cannot include the return of moneys obtained from the default judgments, the class "will 'prevail or fail in unison'" on these points—rendering certification appropriate. *U.S. Foodservice*, 729 F.3d at 119 (quoting *Amgen*, 133 S.Ct. at 1191). Thus, far from providing an obstacle to class certification, the legal questions Defendants have raised demonstrate only that class certification was appropriately granted.

This Court should not now address the merits of the *Rooker-Feldman*, FDCPA, or RICO questions Defendants raise. The appropriate time for this Court to pass on these questions is after the district court has first addressed the issue on summary judgment or at trial. *Id.* Should this Court nonetheless be inclined to address the merits of these common questions, each of these questions should be resolved in the Class's favor, as detailed further *infra* VIII.

## III.    RULE 23(B)(3) IS SATISFIED BECAUSE COMMON QUESTIONS REGARDING THE AFFIDAVITS OF MERIT PREDOMINATE

### A.    The District Court Appropriately Analyzed Predominance And Determined That Common Questions Predominate

Defendants misrepresent Judge Chin's opinion when they argue that he did not correctly analyze the predominance question. Judge Chin correctly explained that a class could only be certified if those "legal or factual questions" that can be resolved by "generalized proof . . . are more substantial than the issues subject only to individualized proof." SA20. This is indisputably an accurate summary of the law. *See Amgen*, 133 S.Ct. at 1196; *U.S. Foodservice*, 729 F.3d at 118. The District Court then appropriately applied that law, holding that the issue that predominates, namely:

> [whether] defendants' uniform, widespread practice of filing automatically-generated form affidavits of merits based on 'personal knowledge' . . . to obtain default judgments against debtors in state court . . . violates the FDCPA, New York GBL § 349, New York Judiciary

> Law § 487, and/or constitutes a pattern of racketeering
> activity in violation of [RICO]

"does not depend on individualized considerations."  SA37.  The District Court

noted that to the extent "individual issues may exist," they do "not preclude a

finding of predominance."  *Id.*[19]  Defendants have taken this language out of

context to assert that the District Court's "only response was to claim that the need

for some individualized inquiries does not *necessarily* preclude class certification"

without determining "whether common questions *in fact* predominate."  LUK Br.

at 3 (emphasis in original).  To the contrary, the District Court specifically

determined that "the common issues of law and fact presented *in this litigation*

predominate over any individual ones."  SA36 (emphasis added).

Predominance is ultimately a balancing test: what is "more

substantial" as compared between those "legal or factual questions" subject to

"generalized proof" and "the issues subject only to individualized proof."  *U.S.*

---

[19]  As a purported individualized issue, Defendants claim that there are differences between class members because some have entered voluntary settlements with Defendants, in which claims against Defendants were allegedly waived and released.  MSH Br. at 33; LUK Br. at 24.  Defendants never raised this as an individualized issue defeating predominance before the District Court, nor do they cite any evidence in the record of these settlement agreements or any waivers or releases contained therein.  Defendants' attempt to create individualized issues at the appellate level, without first submitting supporting evidence before the District Court, must be rejected.  *See U.S. Foodservice,* 729 F.3d at 121-122 (bald speculation and conjecture that individualized issues exist, without admissible evidence to support the assertions, do not undermine class cohesion and cannot be said to predominate).

*Foodservice*, 729 F.3d at 118 (internal quotations omitted).  Plaintiffs need not "prove that each element of [their] claim is susceptible to classwide proof," but instead must demonstrate only that "common questions *predominate* over any questions affecting only individual class members."  *Id.* (internal quotations omitted; emphasis in original).  Here the District Court considered this balance and determined that common issues predominated.  That factual determination is entitled to deference.  *Id.* at 117.

Moreover, the District Court's conclusion is consistent with this Court's recent decision in *U.S. Foodservice*, which affirmed certification of a RICO class action and held that "fraud claims based on uniform misrepresentations" satisfy predominance because uniform misrepresentations are "susceptible to generalized proof."  *Id.* at 118.  Like here, the defendants in *U.S. Foodservice* attempted to craft individual distinctions to reverse the certification decision, claiming that no class should have been certified because each allegedly fraudulent invoice "concerned different bills of goods with different mark-ups."  *Id.*  This Court disagreed: the misrepresentation—"concealment of the fact of a mark-up inserted by the [shell corporation,] was the same in each."  *Id.*  Here too, the "thrust of the RICO claim" is Defendants' uniform fraud on the court "in the exact same manner."  *Id.* at 119.

**B.    Plaintiffs' Damages Can Be Resolved Class-Wide**

Plaintiffs seek three types of damages: (i) statutory damages, (ii) compensatory damages reflecting return of the moneys wrongfully extracted as a result of Defendants' fraud, and (iii) compensatory incidental damages.  While Defendants seek to defeat certification by claiming that awarding damages will require mini-trials, the vast majority of Plaintiffs' damages can be resolved class-wide.

**1.    Statutory Damages**

Statutory damages are available under the FDCPA and the GBL and indisputably require no individualized inquiry.  *See* 15 U.S.C. § 1692k(a)(2)(B) (statutory damages of not more than $1,000 under FDCPA, but limited to $500,000 in class action); N.Y. GBL § 349(h) (plaintiffs are allowed to recover "actual damages or fifty dollars, whichever is greater").

**2.    Return Of Money Extracted**

Plaintiffs also seek, as compensation for out-of-pocket losses, the return of the money extracted from them as a result of those fraudulent judgments. This too requires no individualized inquiry: the specific amount obtained from each absent class member is readily available from Defendants' own records. These amounts are concrete and absolute.  *See Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (where defendants' own "computerized payroll and time-keeping database would enable the court to accurately calculate damages and

54

related penalties for each claim," district court's denial of class certification was reversible error post-*Comcast*).

The District Court did not resolve whether the Plaintiffs' damages could include "recover[y of] money collected," SA43, because it was premature to resolve the "merits inquir[y]" of available damages categories, *Amgen*, 133 S. Ct. at 1194-95. Specifically, the District Court denied Defendants' request to "include language [in the class certification order] prohibiting plaintiffs from asserting claims to recover money collected or paid out pursuant to any state-court default judgment." SA43. Contrary to Defendants' claim, the availability of a specific category of damages is not relevant for any Rule 23 prerequisite, because regardless of the resolution of the damages question, there is no chance of "individualized and time-consuming" damages calculations. MSH Br. at 27. If Plaintiffs *can* "recover money collected," this matter can be resolved on Defendants' records alone. If Plaintiffs *cannot*, Plaintiffs' damages will be limited to statutory damages and incidental damages. In either case, a class action will definitively answer class-wide questions as to available damages.

Defendants attempt to inject individualized issues by claiming a third potential resolution: Plaintiffs' damages should be reduced by the amount of any valid debt. But such resolution has been foreclosed by Judge Chin's determination that the "validity or existence of the underlying debts are not at issue." SA31. Nor

should this Court hold otherwise; as detailed above, the validity of the debt is irrelevant. *See supra* II.D.

Moreover, even if this erroneous claim found traction, class certification would still be appropriate because any true contest concerning the validity of the debt "will only be sought regarding a limited number of plaintiffs"—if at all. *In re Nassau*, 461 F.3d at 23. In *In re Nassau*, this Court held that it was reversible error not to certify a class of prisoners who were strip searched pursuant to county policy, notwithstanding the district court's conclusion that each plaintiff would have "to show affirmatively that he was strip searched without particularized reasonable suspicion," thus defeating predominance. *Id.* at 223. The Second Circuit disagreed with the district court's predominance analysis: this individualized reasonable suspicion defense did not "foreclose class certification" because "any such 'reasonable suspicion inquiries' will be *de minimis*" as Defendants would have to come forward with an officer who possessed "reasonable suspicion. . . at the time of the search." *Id.* at 224, 230.

Similarly, in *U.S. Foodservice*, a RICO fraud class action, defendants claimed that certain class members *knew* of defendants' fraud and thus could not have relied upon it, defeating predominance. 729 F.3d at 121. *U.S. Foodservice* rejected defendants' claim: because "the record does not contain a single piece of evidence" that defendants could *prove* a specific class member did not rely on the

misrepresentation, such "conjectural" individualized issues cannot defeat predominance. *Id.*

Here too, Defendants cannot prove that class members actually owe the debts in any more than, at most, a "*de minimis*" number of cases. *In re Nassau*, 461 F.3d at 230. After all, Defendants instituted this fraud for the very reason that they lacked the underlying documents necessary to support their lawsuits. When they purchased the debts, they contractually agreed that underlying documents may never be available, and the selling creditors stated that they would not provide supporting documentation, except in very limited circumstances.[20] Accordingly, even if this Court believed that the validity of the debts was relevant, litigating those debts would not predominate in this litigation.

### 3.  Incidental Damages

Finally, the Class seeks compensation for other out-of-pocket losses, such as missed work, bank fees and check cashing fees, transportation, and copying costs. Some of these losses need no individualized inquiry: Defendants'

---

[20] Defendants have sought to bolster their limited documentary evidence by issuing subpoenas in this litigation to the underlying creditors, but they have obtained few supporting documents to date, none of which are in admissible form. There are no supporting documents from the underlying creditors in the class certification record. See *U.S. Foodservice*, 729 F.3d at 121-122 (speculation that individualized issues exist, without admissible evidence to support the assertions, cannot undermine class cohesion and or defeat predominance).

records dictate whether a bank account was frozen, JA464-68, and bank freezing fees are a fixed amount for each bank.

Other losses are indisputably individual, like the travel costs and copying costs that Defendants cite at length in their briefing and the injuries to class members' credit from the default judgments. But such individualized damages are common in class actions and do not defeat certification, *see infra* III.C.

As to these individualized incidental damages, the District Court has a variety of management tools to resolve them, such as bifurcation, the use of a magistrate or special master, alteration of the class definition, the creation of subclasses, or even decertification after a finding of liability. *In re Nassau*, 461 F.3d at 231. While *In re Nassau* (described above) only overturned the district court's failure to certify a liability class, the Second Circuit recognized that this same analysis applied to a damages class as well: "the District Court [shall] consider anew whether to certify a class as to damages as well . . . bear[ing] in mind that '[t]here are a number of management tools available to a district court to address any individualized damages issues.'" *Id.* (quoting *In re Visa Check,* 280 F.3d at 141).

**C.    Any Individualized Damages Inquiry Does Not Defeat Predominance**

As detailed above, the vast majority of the Plaintiffs' damages are common to the class.  There are only two potential categories of individualized damages: incidental damages and, *only if the Court holds that the validity of the debt is relevant to damages*, those few cases where Defendants could prove the debt was actually owed.  These insubstantial issues do not defeat predominance.

### 1.    The Supreme Court Has Ruled: "Individualized monetary claims belong in Rule 23(b)(3)"

As the Supreme Court stated in *Wal-Mart*:  "[W]e think it clear that individualized monetary claims belong in Rule 23(b)(3)."  131 S. Ct. at 2558. Thus, the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3).

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), does not change the requirements under Rule 23(b)(3) or prohibit certification where individualized damages exist.  *Id.* at 1433 (explaining that the case was a "straightforward application of class-certification principles").  The well settled law—recently reaffirmed in *Wal-Mart*—remains that a Rule 23(b)(3) class is appropriate to resolve "each class member's individualized claim for money."  *Wal-Mart,* 131 S. Ct. at 2558; *see also* Rubenstein, Newberg on Class Actions § 4:54 at 205 (5th ed. 2012) ("individual damage[s] calculations should not scuttle class certification under Rule 23(b)(3)"); *Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010) ("[I]t is well-established that the fact that damages may have to be

ascertained on an individual basis is not sufficient to defeat class certification.").

After *Comcast*, as before, the question remains one of determining the most

significant issues for class-wide resolution: "[c]ommon issues may predominate

when liability can be determined on a class-wide basis, even when there are some

individualized damage issues." *In re Visa Check.*, 280 F.3d at 139; *see also*

*Amgen*, 133 S. Ct. at 1191, 1194-95.

      *Comcast* stands for a limited proposition that has no applicability

here: where plaintiffs rely on "a model purporting to serve as evidence of damages

in this class action," the model must measure only those damages attributable to

that theory." 133 S. Ct. at 1433; *see also Levya v. Medline Indus., Inc.*, 716 F.3d

510, 514 (9th Cir. 2013) (*Comcast* requires only "that the plaintiffs must be able to

show that their damages stemmed from the defendant's actions that created the

legal liability"). There, the class action failed because plaintiffs presented no

measure for calculating the damages flowing from the only viable theory of

liability. *Comcast*, 133 S. Ct. at 1433 ("Calculations need not be exact, but at the

class-certification stage (as at trial), any model supporting a plaintiff's damages

case must be consistent with its liability case[] . . . ." (internal citation and

quotation omitted)). In the instant case, Plaintiffs' damages are consistent with the

specific theory of liability alleged and Plaintiffs do not rely on a model or

methodology to assess damages.

Defendants claim that *Comcast* is the death knell of any class action where plaintiffs seek any individualized damages, even if such damages do not predominate.  Defendants are not the first litigants to so argue, and this claim has been repeatedly rejected in the few months since *Comcast* was decided.  *See Leyva*, 716 F.3d at 513 (reversing denial of class certification on predominance grounds and holding that Comcast did not change rule that "presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)," so long as plaintiffs prove "their damages stemmed from the defendant's actions that created the legal liability"); *In re Martins v. 3PD, Inc.*, 2013 WL 1320454, at *8 n.3 (D. Mass. Mar. 28, 2013) (*Comcast* does not "foreclose the possibility of class certification where some individual issues of the calculation of damages might remain, as in the current case, but those determinations will neither be particularly complicated nor overwhelmingly numerous"); *In re High-Tech Employee Antitrust Litig.*, 289 F.R.D. 555, 582 (N.D. Cal. 2013) (predominance satisfied where method of calculating damages is consistent with [plaintiffs'] theory of liability, even though damages will be calculated individually); *Cathode Ray Tube (CRT) Antitrust Litig.*, MDL 1917, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013) ("Contrary to Defendants' arguments, *Comcast* does not require . . . putative class action plaintiffs to prove and calculate their damages at the class certification phase."); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 506 (S.D. Cal. 2013) (certifying

class after *Comcast* where plaintiffs had a "viable theory" regarding damages and noting that if "individual issues as to how much reward each class member is entitled later predominate, the Court can address such concerns at that time").

As the *Comcast* dissent explained—in language with which the majority did not quarrel—"the opinion breaks no new ground," and "should not be read to require, as a prerequisite to certification, that damages attributable to a classwide injury be measurable on a class-wide basis." *Comcast*, 133 S. Ct. at 1436 (Ginsburg, J. and Breyer, J., dissenting) (internal quotations omitted). "Recognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal." *Id.* (citing decisions from the First, Third, Fifth, Six, Second, and Seventh Circuits). The *Comcast* majority had the clear opportunity to support Defendants' arguments here and overturn those decisions holding that individualized damages do not necessarily defeat predominance. It did not.

### D.    The Class Does Not Seek the Benefit of Equitable Tolling

Further distorting the record, Defendants claim that individualized inquiries are necessary to resolve the statute of limitations. But Plaintiffs' motion for class certification made clear that they were not seeking equitable tolling and the statutes of limitations would be calculated based on the date of filing alone.

Pls.' Mem. In Further Supp. of Mot. for Class Certification 26-27 (No. 09-cv-

8486-DC), ECF No. 99.

### E.    Forum and Superiority

#### 1.    A Class Action Is the Superior Method for Resolving the Class Members' Claims, Which Would Otherwise Be Unredressed

Rule 23(b)(3) requires the Court to determine whether the "class

action is superior to other available methods for fairly and efficiently adjudicating

the controversy."  In this case, involving thousands of individuals who have had

sums of money extracted from them through Defendants' unscrupulous practices, a

class action is not only the superior method for resolving their claims, but for most

of the class members, it is the *only* way in which they can challenge Defendants'

practices.  The availability of a class action under Rule 23(b)(3) is intended to

vindicate "the rights of groups of people who individually would be without

effective strength to bring their opponents into court at all."  *Amchem Products*,

521 U.S. at 617 (quoting Advisory Committee Notes to Fed. R. Civ. P. 23).  Often,

the "realistic alternative to a class action is not 17 million individual suits, but zero

individual suits."  *Carnegie v. Household Intern., Inc.*, 376 F.3d 656, 661 (7th Cir.

2004).  "[A] class action has to be unwieldy indeed before it can be pronounced an

inferior alternative—no matter how massive the fraud or other wrongdoing that

will go unpunished if class treatment is denied—to no litigation at all."  *Id.*

Class certification is the superior method of resolving the class members' claims. Each individual member would face an uphill battle in challenging Defendants' fraudulent practices individually. Given the nature of Defendants' fraud, many class members only discover the default judgment entered against them when facing marshals' notices threatening wage garnishment or seizure of their personal property, or after their bank accounts are restrained. Furthermore, the nature of this fraudulent scheme makes it difficult to discern on an individual level. The affidavits are specifically crafted to appear facially valid. Finally, even when consumers learn that they were victims of misconduct, they may not know that they can bring lawsuits. Many individuals assume that it is not economically feasible to consult a lawyer to identify affirmative claims.

For these reasons, individual challenges to Defendants' debt collection practices are unrealistic. A class action, in contrast, is the superior method to prosecute their claims.

### 2.    Defendants Misconstrue the "Forum" Requirement

Rule 23(b)(3) requires the Court to consider, as part of the inquiry as to whether a class action is a superior method of adjudication, "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." The forum question is "one of geography," similar to "venue," *i.e.*, "whether consolidation makes sense *in that district*." 2 Newberg on Class Actions § 4:71

(5th ed.) (emphasis added).  The Advisory Committee notes explain that this provision aims to consider the "desirability of concentrating the trial of the claims in the particular forum . . . in contrast to . . . forums to which they would ordinarily be brought."  Here, the class action mechanism is not "concentrating" claims: the "forums to which [the claims] would ordinarily be brought" would be the Southern (or Eastern) District of New York, because the class is largely New York City Plaintiffs bringing federal claims concerning Defendants' malfeasance in New York City—the very same forum in which the class was certified.  *Cf. Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1191-92 *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001) (denying class certification where potential plaintiffs and witnesses are "found across the country," and "plaintiffs have failed to establish any particular reason why it would be especially efficient for this Court to hear such a massive class action lawsuit").

Yet the Mel Harris Defendants attempt to transform the geographical question of the appropriate venue into a question of the federal courts' capacity to resolve the matter.  As an initial matter, as Defendants did not raise this claim below it is waived and should not be considered by the Court.  *See Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 114 (2d Cir. 2005).

Even if considered, Defendants' strained reading finds no support in the case law and makes no sense.  Plaintiffs do not seek to vindicate a right that

belongs to the state courts, but rather to recover for a distinct injury they personally suffered, and which federal statutes redress.[21]  In passing the FDCPA and RICO, Congress empowered federal courts to resolve claims under these federal statutes; it would undermine the power of the federal courts to claim that only state courts can resolve whether defendants violated the FDCPA and RICO.  *See* 28 U.S.C. § 1331.

Defendants effectively seek to create a new abstention doctrine.  But "abstention can only be invoked in narrowly limited special circumstances," because "Congress imposed the duty upon all levels of the federal judiciary to give due respect to a suitor's choice of a federal forum."  *Zwickler v. Koota*, 389 U.S. 241, 248-49 (1967) (internal quotation marks omitted).  No pre-existing abstention doctrine applies here and defendants cannot rewrite Rule 23(b)(3) to create a new abstention doctrine.  *See infra* VIII.A (*Rooker-Feldman* abstention is inapplicable).

Having chosen to bypass state court procedure and defraud tens of thousands of people for their own financial gain, Defendants cannot now claim to seek the protection of the state court.

---

[21] Defendants deliberately misconstrue Plaintiffs' claims.  Plaintiffs do not contend that the affidavits of merit were not "sufficient" or "adequate" to support the entry of default judgment, MSH Br. at 45, but that they were facially sufficient, yet fraudulent.  Thus Plaintiffs do not ask the federal courts to "consider the sufficiency of state filings" as Defendants suggest.  *Id.*

### 3. The Full Faith and Credit Clause Does Not Undermine Class Certification or Plaintiffs' Claims

For the first time on appeal,[22] Defendants invoke the Full Faith and Credit Act, 28 U.S.C. § 1738 ("FFCA") and contend that its application here undermines class certification.  LUK Br. at 25-26; MSH Br. at 37-38, 45-49. Defendants argue that the FFCA required Judge Chin to give preclusive effect to the state civil court default judgments entered against all class members *absent a solitary exception* which allows federal courts to ignore state court judgments obtained in the absence of jurisdiction.  *Id.*  Defendants' argument is as misleading as it is wrong.

While Defendants are correct that the FFCA does not require federal courts to honor state court judgments entered without jurisdiction, it also does not require federal courts to honor state court judgments obtained by *fraud.*  Here, because Plaintiffs assert two independently actionable sets of fraud claims—one challenging Defendants' uniformly and materially false affidavits of merit, and the other Defendants' wholesale submission of materially false affidavits of service—

_____

[22]  Defendants' failure to raise the argument below constitutes waiver and this Court need not consider this new argument.  *See Allianz*, 416 F.3d at 114 (it is a "well-established general rule that an appellate court will not consider an issue raised for the first time on appeal" (internal quotations omitted)).  Moreover, invoking the Full Faith and Credit Act is the equivalent of asserting a res judicata defense, which is an affirmative defense that must be pleaded, *see* Fed. R. Civ. P. 8(c).  Defendants do not assert res judicata or collateral estoppel as an affirmative defense in their Answers.

federal courts are simply not required to honor Defendants' fraudulently procured default judgments.

The FFCA requires "federal courts to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgment emerged." *Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 466 (1982); FFCA (judicial proceedings of the states "shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such state"). Thus, federal courts must give preclusive effect to New York State court judgments in the same manner as would a New York State court.

In New York, "a judgment of a court having jurisdiction of the parties and the subject matter operates as res judicata in the absence of fraud or collusion, even if obtained upon default." *Parker v. Hoefer*, 2 N.Y.2d 612, 616 (1957) (citing *Riehle v. Margolies*, 279 U.S. 218 (1929)); *see also Morris v. Jones*, 329 U.S. 545, 550-51 (1947) (same); *Fuhrmann v. Fanroth*, 254 N.Y. 479, 482 (1930) (Cardozo, J.) (the "plaintiff, to prevail, must prove that there was fraud in the very means by which the judgment was procured"); *cf.* CPLR 5015(a) (listing grounds for relief from a judgment, including "(3) fraud, misrepresentation, or other misconduct of an adverse party; or (4) lack of jurisdiction to render the judgment"); CPLR

68

5304(b) ("a foreign country judgment need not be recognized if . . . the judgment was obtained by fraud").

Here, of course, Plaintiffs' claims concerning (1) Defendants' uniformly fraudulent affidavits of merit fall squarely under the fraud exception to res judicata, and (2) Defendants' fraudulent affidavits of service meet both the fraud and jurisdictional exceptions to res judicata. In all events, Defendants have no basis for invoking preclusion, which is presumably why they did not do so in their answers or in their arguments opposing class certification below.

As explained in Section IV, Plaintiffs' claims challenging Defendants' fraudulent affidavits of service *are* subject to class-wide resolution. Even if they were not, however, neither the FFCA nor Rule 23(b)(3) superiority concerns would have any effect on Judge Chin's unassailable conclusion that Plaintiffs' claims attacking Defendants' fraudulent affidavits of merit warrant class certification under Rule 23(b)(3).[23]

---

[23] The Mel Harris Defendants also argue that defects in the proof submitted in support of a default judgment are not jurisdictional and do not justify treating the judgment as a nullity. MSH Br. at 46-47. This misses the point. None of the cases cited for this unremarkable proposition concern a claim that the party seeking a default judgment intentionally submitted fraudulent proof – as Defendants did here. Moreover, the Mel Harris Defendants' argument also ignores the documents *required* to be submitted in order to obtain a default judgment for a sum certain in the Civil Court of the City of New York. *See supra* II.B. The checklist provided by the New York City Civil Court unequivocally *requires* the submission of an affidavit containing the proof required by CPLR 3215(f) by a person with

## IV.   PLAINTIFFS' CLAIMS ARISING OUT OF FALSE AFFIDAVITS OF SERVICE CAN BE RESOLVED ON A CLASS-WIDE BASIS

The false affidavits of service prepared and filed by Samserv are both part of a common course of conduct and inflict a common harm upon Plaintiffs and class members when the affidavits were used to procure the default judgment entered against them.[24]  In certifying the class, Judge Chin reviewed the electronic records of service of process and found "substantial support for plaintiffs' assertion that defendants regularly engaged in sewer service."  SA7.  The District Court's finding is not clearly erroneous.  *U.S. Foodservice*, 729 F.3d at 116.

Of special concern to the District Court were the many instances in the records where process servers claimed to be in two or more places at the same time or "where multiple services were purportedly made so close in time that it would have been impossible for the process server to travel from one location to the other as claimed."  SA7.  The record is rife with other indicia of sewer service as well, including impossible travel times, nonsensical routes, abnormally high numbers, and rates of services that wildly vary across individual process servers.

---

"personal knowledge of the facts."  If a movant fails to meet that requirement the clerk's office must reject the motion.

[24] Samserv's argument that it "did not cause the harm complained of" is a merits question that this court should not address at the class certification stage.  *Amgen*, 133 S. Ct. at 1191.

70

This is not a case of a few hundred bad services among thousands of unquestionable ones, as Samserv argues.[25]

Samserv muddies the waters by arguing that telling different lies at different times defeats commonality and typicality.  Samserv Br. at 30.  However, these "minor variations in the fact patterns" do not impede certification because Samserv's affidavits of service were uniformly false.  *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993); *In re Alstom SA Securities Litigation*, 253 F.R.D. 266, 275 (S.D.N.Y. 2008) (even though frauds differed in specific facts, common questions remained such that certification was appropriate); *In re U.S. Foodservice*, 729 F.3d at 118-19 (misrepresentations concerning "different bills" with "different mark-ups" were "susceptible to generalized proof" where the "material misrepresentation" was "the same" in each case).

Plaintiffs' claims challenging Defendants' use of fraudulent affidavits of service can be resolved with common proof on a class-wide basis in two independent ways.

_____

[25] Samserv's argument that its "error rate" was "well under 1%" is erroneous. Samserv Br. at 12.  First, they use the wrong point of comparison.  Only a small sample of their database was analyzed, so the instances of sewer service uncovered must be compared to the total number of samples polled, not to the total number of database entries.  Second, they base this rate only on the 517 instances in which their servers claimed to be at two locations at the same time, but they ignore the hundreds of instances of other incredible data, including impossible travel times, nonsensical routes, abnormally high numbers, and rates of services that wildly vary across individual process servers.

First, as a matter of law, Samserv cannot produce competent evident to establish that anyone was served. The evidence of rampant improprieties in Samserv's records—physical impossibilities of being in two places at the same time, unbelievable rates of personal versus substitute service, etc., *see supra* Facts I.C.2—demonstrates, as Judge Chin found, that Defendants, and, specifically the six process servers who were responsible for serving much of the Class, AA162, "regularly engaged in sewer service." SA7. This deceit destroys any credibility or evidentiary value the affidavits of service may have had.[26] *See, e.g., Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (affirming grant of summary judgment, notwithstanding ostensible credibility dispute, because plaintiff was fundamentally incredible and no reasonable juror "would undertake the suspension of disbelief necessary" to credit plaintiff (internal quotations omitted)).

Their affidavits of service discredited, Defendants must come forward with some other admissible evidence to support their allegations of proper service. *See Continental Hosts, Ltd. v. Levine*, 565 N.Y.S.2d 222 (2d Dep't 1991) (holding

---

[26] Samserv's process servers repeatedly committed perjury by executing and filing false affidavits of service. This fact alone permits a fact-finder to disregard every affidavit of service executed by those process servers. *See* Federal Jury Practice And Instructions, Civil, § 105.04 ("Impeachment—Inconsistent statement or conduct . . . If a witness is shown knowingly to have testified falsely about any material matter, you have a right to distrust such witness' other testimony and you may reject all the testimony of that witness or give it such credibility as you may think it deserves").

that once affidavit of service is discredited, plaintiff is "required to establish by a preponderance of the evidence at a hearing that service was proper").  The only evidence that the process servers could submit in lieu of the affidavits of service are the contemporaneous logbooks they are required to compile, maintain and produce whenever service is challenged in court.  GBL § 89-cc, 22 NYCRR § 208.29.[27]  Without these logbooks, a process server's testimony is unreliable and insufficient as a matter of law.  *See First Commercial Bank of Memphis v. Ndiaye*, 733 N.Y.S.2d 562, 565, (N.Y. Sup Ct. 2001) ("Testimony of a process server who fails to keep records in accordance with statutory requirements cannot be credited."); *Rose Assoc. v. Becker*, 583 N.Y.S.2d 144 (N.Y. City Civ. Ct. N.Y. Cty. 1992) (requiring dismissal in light of the process server's failure to produce all records relating to service); *Inter-Ocean Realty Assoc. v. JSA Realty Corp.*, 587 N.Y.S.2d 837, 839 (N.Y. City Civ. Ct. N.Y. Cty. 1991) (holding that "22 NYCRR Section 208.29 as promulgated requires strict compliance and . . . non-compliance results in the dismissal of the underlying cause of action for lack of jurisdiction"); *see also Barr v. Dep't of Consumer Affairs of City of N.Y.*, 517 N.E.2d 1321, 1322

---

[27] GBL § 89-cc(1) details the information that must be contained in the server's records.   The purpose of the process server record keeping requirements "was to substantially enhance the State's ability to combat the continuing problem of process serving abuse known as 'sewer service.'"  Memorandum of Senator Martin J. Knorr, *Process Serving Abuse "Sewer Service,"* N.Y. State Legislative Annual (1986) at 180.

(N.Y. 1987) ("Furthermore, civil litigants must depend on the accuracy of process servers' records to prove that proper service was or was not made. A process server whose records were illegible, inaccurate and otherwise plainly unreliable lacks credibility." (citation omitted)).[28] This rule recognizes the unlikelihood that a process server will have a specific recollection of a particular act of service by the time it is challenged—making stringent record keeping necessary.

Even though the Samserv Defendants were ordered to produce their logbooks in discovery and were on notice of the relevance of those log books to this action no later than October 6, 2009, none produced a single logbook from the relevant timeframe. Furthermore, Defendants cite no evidence, let alone record evidence, that the process servers have a specific recollection of actually serving any class member during the relevant time frame.[29] Lacking any evidence of

---

[28] *Hudson House, LLC v. Gabriel*, 759 N.Y.S.2d 287 (App. Term. First Dep't 2002) and its progeny are not to the contrary. In *Hudson House*, the court held that the "mere failure to offer into evidence the process server's logbook, which the process server had brought to the hearing," as required by law, was not a defect that required the court to discredit the process servers testimony. *Id.*

[29] Although discovery is ongoing, the depositions of the individual process servers have been completed and contain no such testimony. They are not, however, included in the record on appeal. Samserv devotes much of its brief to claiming they served the named Plaintiffs, who were never served. This argument is irrelevant because, as detailed above, given their missing logbooks, Samserv will be unable to meet its burden of proving—for Plaintiffs or any other members of the class—proper service. For the sake of correcting the record, however, it is worth noting that none of the named Plaintiffs was properly served. Kelvin Perez and Clifton Armoogam did not live at the addresses where service was allegedly

proper service, Defendants cannot meet their burden of proof and will not survive summary judgment.

Second, Plaintiffs can prove class-wide fraud by spoliation. The Samserv Defendants' spoliation of their logbooks—crucial evidence in the case—will be the subject of an appropriate motion for sanctions under Fed. R. Civ. P. 37(b)(2)(A). Plaintiffs will seek an order directing that Plaintiffs' claims of uniform sewer service be deemed established for purposes of this action, and prohibiting Defendants from opposing Plaintiffs' claims concerning the filing of fraudulent affidavits of service, or other similar relief. Insofar as that motion is granted, the fraudulent nature of Defendants' affidavits of service will be established on a class-wide basis.

---

performed, yet the process servers fraudulently swore to have served plaintiffs at their "actual place of . . . residence." *Compare* JA631, 745 *with* JA541, 590, 611. Samserv speculates that a different individual with the same name could have been present at that address. However, the process servers falsely swore that the address served was the actual residence for the specific person named in the lawsuit, not the residence for a different person with the same name. Similarly, in the cases of Monique Sykes and Rea Veerabadren, Samserv averred to have served people named "Ms. Rolanda" and "Mr. Victor," who were allegedly found at Plaintiffs' "actual place of Private Residence," but no such people exist. JA540, 588, 717, 912-14. Samserv grossly misstates the record in claiming that Ms. Veerabadren "conceded" that "service was made" at her address, Samserv Br. at 28. At her deposition, Ms. Veerabadren stated eight times that she lived alone and did not know a Mr. Victor. JA912-14. Samserv's naked musing that a "Ms. Rolanda" and "Mr. Victor," could have been found elsewhere in Plaintiffs' buildings is nothing more than the kind of "bald speculation" that this Court has derided as "far more imaginative than real." *U.S. Foodservice*, 729 F.3d at 122. It certainly does not fulfill their burden of establishing proper service.

Given the disturbing evidence of widespread sewer service, in conjunction with the "loss" of the statutorily mandated records, Plaintiffs' fraud claims are amenable to class-wide resolution even insofar as they are predicated on the perjurious affidavits of service.

## V.      SAMSERV IS A PROPER CLASS ACTION DEFENDANT

Samserv argues that it is not a proper class defendant because it "only" had a direct connection to 60,000 out of approximately 124,000 class members.  Samserv is wrong.  All class members have RICO claims against Samserv, regardless of whether Samserv was directly involved in the service of their individual cases.[30]  *See Sedima, S. P. R. L. v. Imrex Co.*, 473 U.S. 479, 495-97 (1985) ("If the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions, and the racketeering activities injure the plaintiff . . . the plaintiff has a claim under § 1964(c)").  To prevail against Samserv under RICO, class members need not show that Samserv failed to serve them in their individual cases; rather, they must demonstrate, through common proof, (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  18 U.S.C. § 1964(c); *United States v. Allen*, 155 F.3d 35, 40 (2d Cir. 1998).  Because

---

[30] Class members whose state-court cases were not assigned to Samserv for service do not bring FDCPA and GBL claims against Samserv, but rely entirely on RICO.

76

each and every class member has a RICO claim against Samserv, Samserv is a proper class action defendant.

## VI.  THE CLASS CERTIFICATION ORDER COMPLIES WITH RULE 23(C)(1)(B)

Fed. R. Civ. P. 23(c)(1)(B) provides that an "order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel."  The District Court's order fully complies with the rule.  It defines the classes.  It lists the claims to be adjudicated.  And it appoints class counsel.

Leucadia correctly points out that the class certification order must carve out any claims or issues that are not appropriate for class treatment.  *See Comcast*, 133 S. Ct. at 1426 (class certification order limited plaintiffs to a single theory of relief that was capable of common proof).  However, it does not follow that such carve-outs must be part of the class *definition*, as Leucadia asserts.  More fundamentally, the types of issues that the district court must carve out are those that cannot be adjudicated on a class-wide basis, not those that may possibly be adjudicated on the merits against the class.  *Amgen*, 133 S. Ct. at 1191, 1194-95.  In this case, the question of whether *Rooker-Feldman* bars Plaintiffs from seeking certain categories of damages is indisputably a common question that must be answered on a class-wide basis.  Accordingly, it should not be excluded from the class definition.

77

*Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179 (3d Cir. 2006), does not support Leucadia's argument. There, the district court's class certification order employed the term "*inter alia*," which indicated the existence of other claims or issues not specifically listed in the class certification order that the court intended to handle on a class-wide basis. *Id.* at 189 ("the Order's discussion of class claims, issues, or defenses is unclear, intermittent, and incomplete, and nothing in the Order evidences an intent to explicitly define which claims, issues, or defenses are to be treated on a class basis for the remainder of the litigation. . . . The very use of the phrase '*inter alia'* ('among other things') . . . suggests that it is intentionally incomplete."). In approving a class certification order, *Ross v. RBS Citizens, N.A.*, 667 F.3d 900, 907 (7th Cir. 2012), *vacated and remanded on other grounds*, *RBS Citizens, N.A. v. Ross*, 133 S. Ct. 1722 (2013), illustrates how narrow *Wachtel*'s holding is: "If we read Rule 23(c)(1)(B) to require a district court to list any possible method of proof, . . . the length of such an order would border on the absurd. Here, the district court rightfully identified the two critical claims and the potential for an exemption defense, and found that it is all best litigated as a class."

Here, the District Court's order does not suffer from the same infirmity as in *Wachtel*. This Court should not disturb the class definition.

## VII. CERTIFICATION OF A CLASS PURSUANT TO RULE 23(B)(2) IS APPROPRIATE BECAUSE DEFENDANTS ACTED IN A MANNER GENERALLY APPLICABLE TO THE CLASS AND INJUNCTIVE RELIEF WILL BENEFIT THE ENTIRE CLASS

The District Court's certification of a class pursuant to Fed. R. Civ. P. 23(b)(2) is proper and should be upheld. In the Class Certification Order, the District Court certified the following class under Rule 23(b)(2): "all persons who have been or will be sued by the Mel Harris defendants as counsel for the Leucadia defendants in actions commenced in New York City Civil Court and where a default judgment has or will be sought. Plaintiffs in the Rule 23(b)(2) class assert claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961; New York General Business Law (GBL) § 349; and New York Judiciary Law § 487." SA46.

The District Court, recognizing that Defendants are alleged to have acted in an identical manner towards the victims of the fraudulent debt collection practices, appropriately certified a (b)(2) class because the injunctions sought by the Plaintiffs would be "appropriate" for the class as a whole. Fed. R. Civ. P. 23(b)(2). None of the allegedly individualized issues that Defendants attempt to use to distinguish the class members from one another are actually individualized, nor would they prevent the injunctive relief sought by Plaintiffs from benefitting the entire (b)(2) class.

The injunctive relief sought by Plaintiffs meets the crucial requirement for certification under Rule 23(b)(2)—it will benefit the class as a whole, as it "would provide relief to each member of the class." *Wal-Mart*, 131 S. Ct. at 2557. Contrary to Samserv's argument, Plaintiffs specified the injunctive relief sought—an injunction directing Defendants to comply with the CPLR in their debt collection activities, including requiring Defendants: (1) to cease engaging in debt collection practices that violate the FDCPA, RICO, GBL § 349 and JL § 487; (2) to locate and notify class members that a default judgment has been entered against them and that they have the right to file a motion with the court to re-open their case; (3) to serve process in compliance with the law in any and all future actions; and (4) to produce and file affidavits of merit in future actions that truthfully and accurately reflect their personal knowledge of the facts, or lack thereof. JA219.

Each and every class member will benefit from this relief. As the District Court noted in its class certification order, "[t]he record . . . establishes that defendants obtained tens of thousands of default judgments in consumer debt actions, based on thousands of affidavits attesting to the merits of the action" generated *en masse* by a computer program and signed by a law firm employee who "claimed to, but apparently did not, have personal knowledge of the facts to which he was attesting." SA2. The fraudulent affidavits of merit render each and

every one of the default judgments improper, regardless of whether any particular

class member may have been served.  Requiring Defendants to notify each class

member with a default judgment already against them that they have the right to

file a motion to reopen that judgment would provide all of them with the same

relief—the ability to challenge the entry of the improperly-obtained default

judgment.  Similarly, an injunction requiring Defendants to produce and file

affidavits of merit based on personal knowledge, and serve process in compliance

with the law would equally benefit all class members, including those against

whom Defendants may seek a default judgment in the future, by ensuring that any

default judgment is obtained using lawful procedures.[31]  This is true too for the

named Plaintiffs and class members whose default judgments have been vacated,

as Defendants may seek another default judgment against them.

       Defendants' attempts to individualize the (b)(2) class are spurious.

They contend that, for individual class members who did not owe the underlying

debt, the affidavits of merit are irrelevant because they were injured not by any

---

[31] Contrary to Defendants' claims, *see* MSH Br. at 55-56, even class members who
owe some amount of debt will benefit from Defendants' compliance with lawful
procedures.  Either Defendants will not be able to produce an affidavit of merit
based on personal knowledge, which would prevent them from obtaining a default
judgment and using it freeze bank accounts and engage in other collection
practices, or Defendants will be able to produce an affidavit of merit based on
personal knowledge, with the same or corrected amount due, and obtain a proper
default judgment.  Either way, class members benefit from the use of appropriate
procedures.

representation in the affidavit, but by the lack of service that deprived them of the chance to raise valid defenses in state court.  MSH Br. at 52.  In addition, they claim that only those members who were never served will derive any benefit from the injunctive relief.  *Id.* at 54.  Defendants neglect to mention that the default judgment was secured not just by the failure of service, but by the supporting documentation—such as the false affidavit of merit—they filed with the Civil Court, without which the default judgment would not have issued.  For class members who did not owe any underlying debt, the affidavits of merit, which falsely stated that an amount was due and owing, caused undeniable injury by providing a sum certain to serve as the basis for the default judgment.  An injunction requiring Defendants to notify these types of individuals of the ability to challenge the default judgment would serve the same purpose and afford the same relief as it would for individuals who may have owed some amount, but against whom default judgments supported by fraudulent affidavits of merit were also invalid.[32]

---

[32] Mel Harris also asserts that the injunctive relief would provide no benefit to those class members who have no right to reopen their case in state court because the statute of limitations has passed, and they cannot qualify for equitable tolling. However, there is no time limit for vacating a judgment based on improper service or fraud, and when the notice of entry has not been served.  CPLR 5015(a)(1), (3), (4).

Defendants also cannot rely upon purported settlements, in which class members may have waived and released claims against Defendants, to argue that those class

Samserv is appropriately a defendant in the (b)(2) class because the injunctive relief sought applies to all Defendants and, specific to Samserv's activities, requires future service of process in any actions to comply with the law. That the class definition does not refer to Samserv is irrelevant where Samserv is part of Mel Harris and Leucadia's fraudulent scheme, and the injunctive relief sought clearly would apply to Samserv.  Samserv's argument that it did not treat all class members the same way amounts to no more than "minor variations in fact patterns" that do not undermine the underlying and uniformly false nature of the affidavits of service.  *See supra* IV.  Traverse hearings are unnecessary given that allegations of Samserv's false affidavits of service can be resolved on a class-wide basis.  *Id*.[33]  And, despite Samserv's argument that it did not act on grounds that apply generally to the Class, all class members have RICO claims against Samserv because Samserv was engaged in a pattern of racketeering activity that harmed all members of the Class.  *See supra* V.

Defendants contend for the first time, without support, that injunctive relief is inappropriate because there is no indication that class members will

_____

members would not benefit from injunctive relief. Defendants have not pointed to any evidence in the record of such agreements.

[33] Samserv's citation to *Robinson*, 267 F.3d at 164, takes the instruction to district courts to evaluate "judicial economy" out of the context of assessing whether injunctive relief predominates over non-incidental monetary relief where (b)(2) certification is sought.

experience similar service practices or that false affidavits of merit will be submitted in the future.  MSH Br. at 55, 56; Samserv Br. at 46.  Essentially suggesting that the need for injunctive relief is "moot," Defendants have come nowhere near meeting their "heavy burden of persua[ding] the court that the challenged conduct cannot reasonably be expected to start up again."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (omitting internal quotation).   In order to convince the Court that their voluntary cessation of the challenged service and debt collection practices defeats the need for injunctive relief, Defendants must provide facts that make it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.*  The record is devoid of such evidence.[34]

Finally, Samserv's contention that the predominance of monetary damages over injunctive relief precludes the certification of a (b)(2) class is irrelevant where, as here, a (b)(3) class is certified alongside a (b)(2) class.  *See* SA35 (citing *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 237-38 (S.D.N.Y. 2010); *Casale v. Kelly*, 257 F.R.D. 396, 408 (S.D.N.Y. 2009)); *see also Wal-Mart*, 131 S. Ct. at 2558-59 (certification of (b)(3) class, unlike (b)(2) class, requires district court to make findings regarding predominance and superiority).

---

[34] Indeed, Defendants did not change their debt collection practices when the instant lawsuit was filed in 2009.

## VIII. THE THREE MERITS QUESTIONS THAT DEFENDANTS ATTEMPT TO INSERT AT THE CLASS CERTIFICATION STAGE SHOULD ULTIMATELY BE RESOLVED IN THE CLASS'S FAVOR

As detailed above, under governing Supreme Court law, a district court may not "engage in free-ranging merits inquiries at the certification stage." *Amgen*, 133 S. Ct. at 1191. Nonetheless, Defendants ask this Court to resolve three merits inquiries that are common questions that should be decided *after* class certification: *Rooker-Feldman*, FDCPA liability for lies to a court, and injunctive relief under civil RICO. While the resolution of these common questions is irrelevant to certification of the class, if the Court were to reach any of these questions, each should be resolved in Plaintiffs' favor.

### A. *Rooker-Feldman* Does Not Bar Plaintiffs' Damages Claims

*Rooker-Feldman* clearly does not bar Plaintiffs' damages claims. The *Rooker-Feldman* doctrine derives from the principle, embodied in 28 U.S.C. § 1257, that the lower federal courts lack subject-matter jurisdiction over claims that are effectively appeals from state court judgments. The doctrine occupies "narrow ground." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). It bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the federal district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 281. In the Second Circuit, the doctrine has four requirements:

> First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must complain of injuries caused by a state-court judgment. Third, the plaintiff must invite district court review and rejection of that judgment. Fourth, the state-court judgment must have been rendered before the district court proceedings commenced..

*Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005) (internal quotation and modification marks omitted). "[A] federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are *produced* by a state court judgment and not simply *ratified, acquiesced, or left unpunished by it*." *Id.* at 88 (emphasis added).

Leucadia argues that Plaintiffs may not seek damages in the amount of money extracted from Plaintiffs because it was the state court that "caused" Defendants to collect on the judgments. Essentially, Leucadia seeks to blame the state court for the Defendants' own actions. But the state court did not cause Defendants to file fraudulent applications for default judgments, including in each case an identical, false affidavit of merit, nor did the state court order Defendants to collect on the fraudulently-obtained judgments. Plaintiffs do not contest the court clerks' decisions to enter judgments, given the facially valid, yet fraudulent, materials Defendants presented to them. Instead, Plaintiffs claim that Defendants

committed fraud in *procuring* the state court default judgments, and not that the state courts acted incorrectly.

Here, the state court judgments provide a classic example of a state court action that merely "ratified, acquiesced, or left unpunished" Defendants' fraud. Thus, Plaintiffs' claims of litigation misconduct present an "independent claim" that *Rooker-Feldman* does not reach. *Exxon*, 544 U.S. at 293 (quoting *GASH Assocs. v. Rosemont*, 995 F.2d 726 (7th Cir. 1993)). If Plaintiffs succeed in this action, the default judgments will remain legally enforceable—until such time as they are vacated by the state courts.

Ample case law supports the proposition that claims seeking damages for fraud, discrimination, or other litigation misconduct are "independent" of state court judgments and thus not barred by *Rooker-Feldman*. In *Marshall v. Grant*, 521 F. Supp. 2d 240 (E.D.N.Y. 2007), the district court found that a plaintiff's claims of injury as a result of defendants' actions—their alleged perjury, fraud, and misrepresentations during divorce proceedings—were "the type of claims held by the *Exxon Mobil* Court to be independent from the state judgment because they allege fraud in the procurement of the judgment and not just that the state court issued an incorrect opinion." *Id.* at 244-45; *see also Truong v. Wells Fargo Bank, N.A.*, 717 F.3d 377 (5th Cir. 2013) (allegations of foreclosure fraud were "independent claims over which the district court had jurisdiction; Truong did not

87

seek to overturn the state-court judgment, and the damages she requested were for injuries caused by the banks' actions"); *Gabriele v. American Home Mortgage Services, Inc.*, 503 Fed. App'x 89, 92 (2d Cir. 2012) (defendants' "litigation misconduct was not the product of the state court's . . . judgment of strict foreclosure . . . but rather . . . was 'simply ratified, acquiesced in, or left unpunished by [the state court judgment]'"); *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 172 (3d Cir. 2010) (*Rooker-Feldman* did not bar claims that the defendants had conspired to engineer plaintiff's state court loss by exercising improper influence on state judges "because [the plaintiff's] claim for damages is based on an alleged independent violation of [its] constitutional rights,' [and] the source of [the plaintiff's] purported injury was the actions of Defendants . . . , not the state-court decisions themselves"); *Trakansook v. Astoria Fed. Sav. & Loan Ass'n*, No. 07-2224-CV, 2008 WL 4962990, at *1 (2d Cir. Nov. 21, 2008) (no *Rooker-Feldman* bar to claims that plaintiff "was separately and independently injured by Astoria's allegedly discriminatory acts . . . including its decision to move for entry of default in state court"); *Francis ex rel. Francis v. City of New York*, 197 Fed. Appx. 27 (2d Cir. 2006) (challenge to city employee's removal of child did not seek to overturn state court's emergency removal of children and was not barred by *Rooker-Feldman*); *W & D Imports, Inc. v. Lia*, No. 11-cv-4144, 2013 WL 1750892, at *5 (E.D.N.Y. Apr. 22, 2013) (permitting civil

RICO claim for monetary damages from fraud preceding state court judgment, as "the Court could grant such relief without disturbing" the district court judgment).

Leucadia disingenuously claims that it is "well established" that if a state-court judgment awards money to a creditor, an action for damages is barred by *Rooker-Feldman*. Yet the cases it cites do not support the point. In *Gray v. Americredit Financial Servs., Inc.*, No. 07 Civ. 4039, 2009 WL 1787710 (S.D.N.Y. June 23, 2009), the plaintiff filed a "PETITION TO OVERTURN STATE COURT RULING" that expressly sought an order reversing the decision of the state court. In *Trakansook*, the court applied *Rooker-Feldman* only to those claims that sought specifically to reverse the foreclosure of her home; her due process claims for money damages were held to be independent of the state-court judgments and were denied for other reasons.

Only *Coble v. Cohen & Slamowitz*, 2013 WL 1500418 (S.D.N.Y. Apr. 10, 2013), is even arguably relevant, but the decision is not well reasoned, as it cites no authority for its conclusion and fails to consider whether plaintiffs alleged claims independent of the state court judgments.[35] It is noteworthy, however, that

---

[35] Defendants also rely upon *Raydos v. Cohen & Slamowitz, LLP*, No. 08 Civ. 4A, 2009 WL 2929166 (W.D.N.Y. Sept. 9, 2009), for the proposition that a suit for actual damages alleging violations of the FDCPA is barred by *Rooker-Feldman*. However, the court's musings about actual damages (which were not alleged) were entirely *in dicta*, and there was no issue of fraud in the procurement of the state-court judgment.

an earlier opinion in *Coble* held that the plaintiffs had stated a claim under the

FDCPA based on defendants' continued enforcement of judgments that had been

fraudulently obtained.  824 F. Supp. 2d 568, 572 (S.D.N.Y. 2011).

      The overwhelming weight of authority follows the Supreme Court's

declaration that a federal court decision may "den[y] a legal conclusion that a state

court has reached in a case to which [the plaintiff] was a party," *Exxon Mobil*, 544

U.S. at 293, without running afoul of *Rooker Feldman*.  Thus, in *Mascoll v.

Strumpf*, No. 05 Civ. 667, 2006 WL 2795175, at *8 (E.D.N.Y. Sept. 26, 2006), the

court held that *Rooker-Feldman* did not bar plaintiff's claims under the FDCPA

and GBL because she sought only money damages and not "an order vacating the

Nassau County court's judgment," such that the federal court action "would

continue even if the state-court judgment were vacated."

      As the Third Circuit explained, while a "claim for damages may

require review of state-court judgments and even a conclusion that they were

erroneous, those judgments would not have to be rejected or overruled" for

plaintiff to prevail.  *Great Western*, 615 F.3d at 173; *see also McNamara v. Kaye*,

360 Fed. Appx. 177 (2d Cir. 2009) ("*Rooker-Feldman* only applies when the

requested federal court remedy of an alleged injury caused by a state court

judgment would require overturning or modifying that state court judgment.

Inasmuch as McNamara's claims . . . seek damages and prospective relief rather

than a modification of her suspension or reinstatement orders, her claims would not appear to be barred by *Rooker-Feldman*.") (internal citation omitted); *Shechet v. Abby Favali Corp. Counsel NYC*, No. 05-CV-5027, 2006 WL 1308656 (2d Cir. May 9, 2006) ("Shechet does not seek reversal of the child-support orders—relief clearly barred by *Rooker/Feldman*, even as narrowed by *Exxon*—but rather seeks money damages, under 42 U.S.C. § 1983, for Defendants' conduct during the state court proceedings.  Providing such relief would not require disturbing the child-support orders themselves, and thus, under *Exxon*, this case presumably avoids *Rooker/Feldman*'s jurisdictional bar." (internal citation omitted)); *Drees v. Ferguson*, 396 Fed. App'x 656 (11th Cir. 2010) ("[T]he *Rooker-Feldman* doctrine does not apply when a party seeks money damages for the state court's alleged constitutional deprivations"); *Dowlah v. Dowlah*, No. 09 Civ. 2020, 2010 WL 889292 (E.D.N.Y. Mar. 10, 2010) ("[C]laims seeking only monetary damages or prospective-only relief against court procedures rather than modification of a family court's temporary custody or other orders would not run afoul of the *Rooker-Feldman* doctrine.").

As the Seventh Circuit explained in *Nesses v. Shepard*, 68 F.3d 1003, 1004 (7th Cir.1995) (Posner, J.), if a litigant claims "that people involved in the [state-court] decision violated some independent right of his," he can "sue to vindicate that right and show as part of his claim for damages that the violation

caused the decision to be adverse to him and thus did him harm.  Otherwise there

would be no federal remedy for a violation of federal rights whenever the violator

so far succeeded in corrupting the state judicial process as to obtain a favorable

judgment."

      In sum, Plaintiffs do not contend that the state court was incorrect in

issuing the judgments, nor do they seek to reverse them with this action.  Plaintiffs

instead raise independent claims that Defendants violated their rights by

fraudulently procuring judgments against them, and they seek damages for their

harm, as they are entitled to do, *see supra* III.B.  *Rooker-Feldman* does not bar

their damages claims.

    **B.**    **FDCPA Applies to Statements Made by Defendants to Courts**

      Although they cloak their argument as a predominance obstacle, in

actuality Defendants improperly ask this Court to make a substantive

determination about whether the FDCPA applies in this case.  LUK Br. at 34;

MSH Brief at 39.  Defendants' attempt is off the mark because there can be no

question that the FDCPA prohibits Defendants from obtaining default judgments

on the basis of false affidavits submitted to the courts.

      Congress enacted the FDCPA "to eliminate abusive debt collection

practices by debt collectors." 15 U.S.C. § 1692(e); *see also Jerman v. Carlisle,*

*McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573 (2010) (referencing the Act's

"broadly worded prohibitions on debt collector misconduct").  To that end, the

FDCPA broadly forbids debt collectors from using "any false, deceptive, or

misleading representation or means in connection with the collection of any debt,"

§ 1692e, or any "unfair or unconscionable means to collect or attempt to collect

any debt," § 1692f.

This Court must enforce the statute according to its terms.  "The plain

meaning of legislation should be conclusive, except in the rare cases in which the

literal application of a statute will produce a result demonstrably at odds with the

intentions of its drafters." *Goldman v. Cohen*, 445 F.3d 152, 155 (2d Cir. 2006)

(quoting *United States v. Ron Pair Enters., Inc.* 489 U.S. 235, 242 (1989)).  In this

case, a literal interpretation of the statute will further Congress's intent to protect

consumers from debt collection abuse.  "It is clear that Congress painted with a

broad brush in the FDCPA to protect consumers from abusive and deceptive debt

collection practices, and courts are not at liberty to excuse violations where the

language of the statute clearly comprehends them."  *Pipiles v. Credit Bureau of*

*Lockport, Inc*., 886 F.2d 22, 38 (2d Cir. 1989); *see also Hooks v. Forman, Holt,*

*Eliades & Ravin, LLC*, 717 F.3d 282, 286 (2d Cir. 2013) ("We are not at liberty to

substitute a view different from that expressed by Congress in the legislative

enactment.").

Specifically, attesting that a statement is based on personal knowledge when it is not is a deceptive representation in violation of § 1692e. *See Midland Funding LLC v. Brent*, 644 F. Supp. 2d 961 (N.D. Ohio 2009) (finding that false statements of personal knowledge violate § 1692e). Furthermore, use of false affidavits to obtain default judgments constitutes a "deceptive . . . means" of collecting a debt in violation of § 1692f. *Dina v. Cuda*, No. 3:12-cv-0523, 2013 WL 2995439, at *26 (D. Conn. 2013).

Here, Plaintiffs have alleged – and the District Court found – that Defendants filed "hundreds of affidavits a week, purportedly based on personal knowledge, purporting to certify that the action has merit, without actually having reviewed any credit agreements, promissory notes, or underlying documents, and, indeed, without even reading" them, and that they used these false and deceptive affidavits to obtain default judgments against class members. SA11. In particular, Fabacher's affidavits contained "false, deceptive, or misleading representation[s]" that he had personal knowledge that a debt was owed, when in fact he did not, and Defendants used these affidavits "in connection with" their debt collection efforts. The plain language of the FDCPA covers Defendants' acts.

Defendants' reliance on *O'Rourke v. Palisades Acquisition*, 635 F.3d 938, 941 (7th Cir. 2011), for the proposition that a misleading communication to a state court does not violate the FDCPA, is misplaced. *O'Rourke* is wrongly

94

decided, and this Court should decline to follow it.  The Seventh Circuit departs

from the plain language of the statute, contravening basic principles of statutory

interpretation.  *See id.* at 942 ("Although the section's language has no specific

limits . . . [t]here must be a limiting principle.").  This approach conflicts with that

of the Supreme Court in *Heintz v. Jenkins*, 514 U.S. 291, 298 (1995), which

teaches that the only valid "limiting principle" is "the plain language of the Act."

The plain language of § 1692e does not state that false representations must be

made directly to the consumer in order to be actionable.[36]

      *Kropelnicki v. Siegel*, 290 F.3d 118 (2d Cir. 2002), cited by

Defendants, is not to the contrary.  There a debt collector discouraged

Kropelnicki's attorney from formally appearing in a state court collection case and

then entered a default judgment against her.  While not definitively ruling on the

issue, the Second Circuit found "serious flaws" in the "argument that a violation of

the FDCPA occurs where a party alleges that his attorney has been misled to the

party's detriment" because "[w]here an attorney is interposed as an intermediary

between a debt collector and a consumer, we assume the attorney, rather than the

---

[36] Leucadia hypothesizes a parade of horrors that would occur if Defendants are
held accountable for their actions under the FDCPA.  LUK Br. at 37 (threatening
that a ruling in plaintiffs' favor would "paralyze state debt-collection proceedings"
and "federalize large swaths of state-court legal practice").  However, when
confronted previously with similar arguments about upsetting the status quo in
state debt collection cases, the Supreme Court has twice unambiguously rejected
those arguments.  *Jerman*, 599 U.S. at 599-600; *Heintz*, 514 U.S. at 295-97.

FDCPA, will protect the consumer from a debt collector's fraudulent or harassing behavior." *Id.* at 127-28. The present case, however, does not concern alleged misrepresentations to attorneys; indeed, the class members here uniformly lacked legal counsel to protect them from abusive debt collection. Likewise, the state courts could not protect class members' interests, as Defendants blithely suggest, because Defendants actively withheld from the state courts the very information— an honest statement of the information within Defendants' personal knowledge— that they would need to do so.[37] *Kropelnicki* presents an entirely different scenario, and it does not govern here.

Furthermore, this Court need not wade into the *O'Rourke* thicket, because Defendants' acts also violate an entirely different section of the FDCPA: § 1692f. This provision bars the use of "unfair or unconscionable means" to collect a debt, and courts have used it as a "catchall provision" to address unfair conduct not specifically addressed elsewhere in the FDCPA, including litigation-related misconduct. *See, e.g.*, *Okyere v. Palisades Collection, LLC*, No. 12 Civ. 1453, 2013 WL 5085148 (S.D.N.Y. Sept. 16, 2013) (analyzing § 1692f and citing

---

[37] Mel Harris Defendants assume that the purpose of prohibiting debt collectors from using false affidavits to obtain default judgments in state court is to protect the court, and they argue that the FDCPA should not serve this purpose. See MSH Br. at 42. However, the goal of the prohibition is not to protect courts, but to protect people from having default judgments entered against them without their knowledge and on the basis of false statements – a goal that is manifestly within the scope of the FDPCA.

cases); *Polanco v. NCO Portfolio Mgmt., Inc.*, 930 F. Supp. 2d 547, 552 (S.D.N.Y. 2013) ("Here, Defendant's alleged actions of fraudulently using the court's power to secure a default judgment and subsequent garnishment . . . falls within the FDCPA's broad purpose to protect consumers from such alleged abusive and unfair tactics.").  Accordingly, even though the question of the FDCPA's applicability to Defendants is not properly before this Court, the resounding answer is that Defendants' conduct violates multiple provisions of the FDCPA.

### C.    Injunctive Relief Is Available to the Class Under RICO

Injunctive relief is available to private parties bringing a civil RICO claim.  Though the Second Circuit has not directly addressed the issue, the text and purpose of RICO, as well as analogous text in other statutes that are construed to include injunctive relief, offer persuasive evidence that such relief is available. Cases from the Seventh Circuit and the Southern District of New York outline the statutory basis for the availability of injunctive relief to private parties, and the reasoning therein should be adopted over earlier cases that rely on principles now rejected by the Supreme Court.[38]

---

[38] *Compare NOW, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001), *rev'd on other grounds* 537 U.S. 393 (2003) (injunctive relief available to private parties under RICO) *and Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239, 243-44 (S.D.N.Y. 2002), *rev'd on other grounds* 322 F.3d 130 (2d Cir. 2003) (same) *with Religious Technology Ctr. v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986) (rejecting availability of private injunctive relief).  The case law cited by Defendants

First, the statutory text of RICO provides for the availability of injunctive relief for private parties.  RICO's civil remedies section provides:

> (a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person . . . ; or ordering dissolution or reorganization of any enterprise . . .

> (b) The Attorney General may institute proceedings under this section. Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions, or take such other actions . . . as it shall deem proper.

> (c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . .

18 U.S.C. § 1964.  Subsection (a) sets forth the general jurisdiction for district courts to hear RICO claims and grants district courts the power to issue various remedies, including injunctive relief.  *See id.* § 1964(a).  Subsections (b) and (c) specify additional forms of relief available to the Attorney General and to private

---

predating *Wollersheim* should also be rejected as unpersuasive.  *See Sedima, S.P.R.L. v. Imrex Co.*, 741 F.2d 482, 490 (2d Cir. 1984), *rev'd on other grounds* 473 U.S. 479 (1985); *Trane Co. v. O'Connor Secs.*, 718 F.2d 26 (2d Cir. 1983); *DeMent v. Abbott Capital Corp.*, 589 F. Supp. 1378, 1383 (N.D. Ill. 1984).

parties, respectively.  Subsection (b) authorizes courts to provide interim relief, such as restraining orders, when sought by the Attorney General, in addition to the remedies afforded by subsection (a).  Similarly, subsection (c) authorizes private parties to obtain treble monetary damages in addition to the remedies provided by subsection (a).

In *Scheidler*, the Seventh Circuit adopted this interpretation of the statutory text.  267 F.3d at 696-97.  The court noted that subsection (b) only authorizes the government to seek *interim* equitable relief, while the authority to obtain permanent injunctive relief is derived from the general grant of authority found in subsection (a) for district courts to enter injunctions.  *Id.* at 697.  Since the government's authority to seek injunctive relief finds its basis in the combination of "the grant of a right of action to the Attorney General in § 1964(b) and the grant of district court authority to enter injunctions in § 1964(a), we see no reason not to conclude, by parity of reasoning, that private parties can also seek injunctions under the combination of grants in §§ 1964(a) and (c)." *Id.*  The *Scheidler* court adopted the reasoning set forth by the Supreme Court in *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 90 (1998), to hold that § 1964(a) both conferred jurisdiction on the district courts and specified certain remedial powers in the cases that are brought before them, including those by private parties.  *Scheidler*, 267 F.3d at 697.  *Scheidler*'s interpretation of RICO vests each part of § 1964 with

meaning.  An interpretation limiting injunctive relief to the Government under

subsection (b) would render the provision of injunctive relief in subsection (a) a

"nullity."  *Id.* (citing *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253 (1992)

("courts should disfavor interpretations of statutes that render language

superfluous")).  Finally, the *Scheidler* court rejected the notion that it should be

"chary" of reading a remedy into subsection (c), since subsection (a) explicitly

provides for injunctive relief to be available to all parties, including those given

additional remedies in subsections (b) and (c).  *Scheidler*, 267 F.3d at 697-98

(citing *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19 (1979)).

Judge Rakoff, in *Uzan*, also noted that nowhere in section 1964 does Congress

expressly deny the right of district courts to grant injunctive relief, which is among

the powers they may exercise pursuant to the equity jurisdiction conferred by the

Judiciary Act of 1789.  *See Uzan*, 202 F. Supp. 2d at 243.

     Second, affording private parties the right to seek injunctive relief

furthers the purposes behind RICO.  *See Scheidler*, 267 F.3d at 698; *see also*

*Chambers Dev. Co. v. Browning-Ferris Indus.*, 590 F. Supp. 1528, 1540-41 (W.D.

Pa. 1984).  Congress expressly provided that RICO is to be "liberally construed to

effectuate its remedial purposes."  Pub. L.  No. 91–452, § 904(a), 84 Stat. 947

(1970).  Congress intended to "encourag[e] civil litigation to supplement

Government efforts to deter and penalize the . . . prohibited practices.  The object

of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity." *Rotella v. Wood*, 528 U.S. 549, 557 (2000).

Finally, contrary to the Defendants' characterization, the remedies afforded under the Clayton Act support a reading of RICO to include injunctive relief for private parties. Section 16 of the Clayton Act provides that private parties may sue for injunctive relief. *See* 15 U.S.C. § 16. The Supreme Court has interpreted § 16 of the Clayton Act broadly to encompass all forms of traditional equitable relief, in line with Congress's "clear intent to encourage vigorous private litigation against anticompetitive mergers." *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990). Given that the Supreme Court regularly treats the remedial sections of the Clayton Act and RICO identically, section 1964 should similarly be construed to afford private parties an injunctive remedy. *See, e.g.*, *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188–89 (1997) (applying Clayton Act rule for accrual of cause of action to RICO); *Holmes v. SIPC*, 503 U.S. 258, 267 (1992) (applying proximate cause rule to RICO). The Supreme Court's statements regarding the private treble-damages provision of RICO should not be read to foreclose the availability of injunctive relief because, in none of these cases did the Supreme Court squarely confront the issue of injunctive remedies. *See Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 150-51 (1987);

*Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 240 (1987); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 492-93 (1985).

Defendants rely on RICO's legislative history in a manner that has been discredited both in method and substance.  First, the use of failed Congressional amendments and legislation to demonstrate Congressional intent are, as the Supreme Court has noted, "particularly dangerous ground upon which to rest an interpretation of a prior statute," because bills can be rejected for any number of reasons.  *Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs,* 531 U.S. 159, 169–70 (2001); *see also Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994) ("Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change.").  Second, the Supreme Court rejected in *American Stores* the Ninth Circuit's use of legislative history in construing the Clayton Act to limit the grant of private injunctive relief, indicating that the Ninth Circuit's similar use of legislative history in *Wollersheim* cannot survive scrutiny.  *See Scheidler*, 267 F.3d at 700.  Third, the "snippets of legislative history" relied on by Defendants cannot serve as the "clearly expressed legislative intent" necessary to cast doubt on unambiguous statutory language.  *Scheidler*, 267 F.3d at 699.  Finally, there is contrary legislative history indicating

102

that Congress did not intend to restrict private parties to money damages in section

1964(c), but intended to supplement the equitable relief already available in section

1964(a), (b).  *See Uzan*, 202 F. Supp. 2d at 244.[39]

## CONCLUSION

The District Court's Order should be affirmed.

Dated:    November 6, 2013
          New York, New York

                                    Respectfully submitted,

                                    EMERY CELLI BRINCKERHOFF
                                    & ABADY LLP
NEW ECONOMY PROJECT                 _____/s/_____
Josh Zinner
Susan Shin                          Matthew D. Brinckerhoff
Claudia Wilner                      Jonathan S. Abady
176 Grand Street, Suite 300         Debra L. Greenberger
New York, NY 10013                  Vasudha Talla
                                    75 Rockefeller Plaza, 20th Floor
MFY LEGAL SERVICES, INC.            New York, New York 10019
Carolyn E. Coffey
Ariana Lindermayer                  Charles J. Ogletree, Jr.
Of Counsel to Jeanette Zelhof       Harvard Law School
299 Broadway, 4th Floor             1563 Massachusetts Avenue,
New York, New York 10007            Boston, MA 02138

*Counsel for Plaintiffs-Appellees*

---

[39] Even if injunctive relief is not available under RICO, the District Court did not err in certifying a class under 23(b)(2).  Section 349(h) of the GBL provides that any person who has been injured by a deceptive trade practice in violation of the GBL "may bring an action in his own name to enjoin such unlawful act or practice," an action for monetary damages, or both.  N.Y. Gen. Bus. Law § 349(h); *see also Barkley v. United Homes, LLC*, 848 F. Supp. 2d 248, 273 (E.D.N.Y. 2012) (recognizing § 349(h) to authorize injunctive relief and granting plaintiffs permanent injunction).

**CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32(a)**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). It contains 24,734 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman.

Dated: November 6, 2013